SEYMOUR and BROWN *vs.* THE CANANDAIGUA AND NIAGARA FALLS RAIL ROAD COMPANY and others.

An agreement for a lien is a lien, in equity, when it is clear that it was the intention of the parties to give, or create, such lien; and it will be preferred to the claims of subsequent judgment creditors.

But it must be the intention of the parties to create a lien, and the lien must have a specific reference; and must necessarily apply to some designated property, either *in esse* or in expectancy, and this clearly and unmistakably. Unless the agreement or mortgage plainly describes or designates particular lands, it will be regarded as a mere executory contract, and enforceable only as such.

Whenever parties, by their contract, intend to create a positive lien or charge, either upon real or personal property, and whether then owned by the assignor or contractor, or not; or, if personal property, whether it is then in being or not, it attaches, in equity, as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto.

Hence, a grant of particular lands to be acquired *in futuro* is valid, and takes effect as a specific lien upon the lands, as soon as they are acquired.

Where a rail road company executed a mortgage upon its rail road " *constructed and to be constructed,*" and upon all the railways, rails, bridges, fences, privileges, rights and real estate then owned by the said company, or which should thereafter be owned by them, and all lands used and occupied, or which might thereafter be used and occupied, for railways, depots or stations, with all

buildings erected or which might thereafter be erected thereon; *Held* that the mortgage embraced, and was a valid lien upon, all the property therein described, whether the same was then owned by the company, or was acquired subsequently, for the purposes of its rail road.

*Held also*, that the company, being authorized by its charter to lay out its road not exceeding six rods in width, to which strip of land the right of the company was absolute, as soon as it had made compensation therefor, the description, in the mortgage, of the land then owned or thereafter to be owned, by them, must be deemed as referring to that strip, and as designating the same with sufficient particularity and minuteness.

The legislature, by the 10th subdivision of section 28 of the general rail road act, authorizing rail road corporations organized under that act, " from time to time to borrow such sums of money as may be necessary for completing, or furnishing, or operating their rail road, and to issue and dispose of their bonds for the amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company" for that purpose, intended to give authority to rail road corporations to mortgage all their property, with all their franchises, rights and interests, acquired and to be acquired, as an entirety. And the mortgage in this case being made in pursuance and by virtue of this statute, and being authorized by it, and embracing the whole rail road and all the real property of the corporation, and its entire franchises, in as full and complete a manner as the corporation could possess, exercise and enjoy such rights and franchises; *Held* that upon this ground, independent of the rule in equity above referred to, the mortgage covered and embraced the subsequently acquired lands.

That it was therefore immaterial whether the right of way was all acquired, or not, at the time the mortgage was recorded; or whether the road had, or had not, been at that time entirely located, or the location thereof, if previously made, was afterwards changed.

The right to change its location was one of the chartered privileges of the corporation, and was embraced within the grant of its franchises.

It was also *held* that the branch track, from the main track at Tonawanda to Niagara river, although not laid out at the time of the original location of the road, and not then projected or contemplated, was covered by the mortgage, as an incident to the principal subject of the grant.

But it was *further held*, that the equitable rights of the mortgagees extended only to the particular lands designated by statute, and which the company was authorized to take, and did take, for the use of its road.

That the company was authorized to purchase and hold such lands as were necessary for depots, stations, warehouses, wood yards, shops, and other legitimate rail road purposes; and all such lands, with the erections thereon, passed to the mortgagees, as part of the rail road, or as essential to its use and enjoyment. But that lands acquired by the rail road company, and not thus used for rail road purposes, did not come within the description of the premises mortgaged.

That upon the lands last mentioned, lying outside of the legal limits of the rail road track and branches, and upon all the land owned by the company and not used for shops, depots, stations, turnouts for wood or water, or other legitimate purposes, the mortgagees had no legal or equitable lien, by virtue of their mortgage, and such lands were liable to the legal liens and claims of the other creditors of the corporation.

A reference was therefore ordered, to ascertain what lands were owned by the rail road company which were subject to the lien of the judgments against the company, and to determine the relative rights of the judgment creditors, in respect to such lands, as between themselves.

THIS action was commenced for the foreclosure of a mortgage, given by the Canandaigua and Niagara Falls Rail Road Company upon its rail road, track and franchises, and appurtenances, to secure the payment of $1,000,000 of the bonds of said company, issued to, and held by, different persons. The mortgage was executed in due form, and bore date March 17, 1852.

The defendants were duly organized as a corporation, under the general rail road act of this state, passed April 2, 1850, for the purpose of constructing a rail road between the village of Canandaigua in the county of Ontario, and the suspension bridge over the Niagara river, near the village of Niagara Falls. It did not appear at what precise date the company were organized; but from the proceedings of the company, produced in evidence, it must have been in or before the year 1851. And from like proceedings it appeared that the route of the said road was surveyed in or before the termination of the said year 1851. From proceedings of the board of directors, of March 18, 1852, in evidence, it appeared that they claimed or asserted that the route of the said road, from the Genesee river west to the Tonawanda creek, had been located before that time; that on the 16th of April, 1852, the directors altered the route; and that the route from Tonawanda to Niagara Falls was also altered July 16, 1852.

It was in proof that a certificate of location in Erie county, according to the statute, with a map or profile annexed, was filed in Erie county clerk's office on the 4th day of April, 1852. This location of the road crossed the Tonawanda creek at a con-

siderable distance east of Tonawanda village, and laid down no branch track to the river.

On the 22d of December, 1852, the company changed, in due form, the location of their road for a considerable distance in Erie and Niagara counties, and laid down a branch or side track in the village of Tonawanda, from such altered line to the Niagara river, a distance of 7132 feet; and filed a map and certificate of such change in the clerk's office of Erie county, December 30, 1852, and in the Niagara county clerk's office December 31, 1852.

It did not appear when the work of constructing the rail road was actually commenced; or when the company commenced acquiring the title to lands needed for it; or what lands, if any, were actually acquired before the date or giving of the mortgage in question. It appeared that the road was open for travel from Canandaigua to Batavia, in January 1853, and thence west to the suspension bridge, in July 1853; thus completing the line of railway from New York to the suspension bridge via the New York and Erie rail road.

The mortgage was recorded in the counties of Ontario, May 3, 1852, Monroe May 4, Erie and Niagara May 5, Livingston May 6, and Genesee June 10; the rail road being situated in parts of said counties. The mortgage, after reciting that the said rail road company, in pursuance of the power conferred upon them by the act of the legislature of the state of New York, entitled "An act to authorize the formation of rail road corporations, and to regulate the same," passed April 2, 1850, were then engaged in constructing a rail road from Canandaigua to the suspension bridge in the village of Niagara Falls; and that the said company, for the purpose of completing and operating the said rail road, had deemed it necessary to borrow money, and had resolved to borrow $1,000,000, to be applied to the construction and completion of the said rail road, and to issue bonds in the sum of $1000 each, to be secured by a mortgage, did for that purpose "grant, convey, transfer and set over" to the plaintiff and one George S. Coe, in trust for said bond holders, "the said rail road *constructed and to be con-*

*structed,* together with all and singular the railways, rails, bridges, fences, privileges, rights and real estate now owned by said company, or which shall hereafter be owned by them, and all the tolls, incomes, issues and profits (whenever the said party of the first part shall be in default of making payment) to be had from the same, and all the franchises of the said company, and all lands used and occupied, or which may hereafter be used and occupied for railways, depots or stations, with all buildings erected or which may hereafter be erected thereon." The company covenanted, in said mortgage, to use the money borrowed in the construction of the rail road, and to make, execute and deliver all and singular and further assurances and instruments as should *from time to time* be necessary and as the counsel of the trustees should advise or require—so as to embrace said rail road when complete, and all its property intended to be conveyed or acquired, and to be *thereafter acquired.*

On the 16th of April, 1853, the company executed a second like mortgage, to secure another loan of $750,000, which contained the following clause: " Subject to a previous mortgage, of sterling bonds equivalent to $1,000,000." Also, on the 20th of December, 1853, a third mortgage was executed by the company to secure another loan of $600,000, subject to the two mortgages above mentioned, in the same manner.

The defendant Hinds, on the 10th of June, 1854, recovered a judgment against the rail road company, for $12,227, of which a transcript was duly filed in the counties of Erie and Genesee July 11, and Niagara July 12, and were duly docketed. The defendants Otis and Worthington, on the 30th day of June, 1854, recovered a judgment against the rail road company for $698.34, of which transcripts were duly filed and judgment docketed July 5 and 6 thereafter, in Niagara, Genesee, Ontario, Monroe and Livingston counties, and on the 23d in Erie county.

The premises whereon the branch track was built, at Tonawanda, as soon as located from the present main track to Niagara river, and the lands occupied by the dock and warehouses of the company on the river, were conveyed to the company subsequent to the recording of the plaintiff's mort-

Seymour v. Canandaigua and Niagara Falls R. R. Co.

gage, and on or about the first day of March, 1853. The judgment of the defendant Hinds was recovered for work done and materials furnished in constructing such docks. The title to the lands occupied by the branch track and dock was purchased by the company as above stated, and paid for in the stock of the company. An association was formed at Tonawanda, in 1852, of which Hinds was a member, to secure and divert a portion of the business from Lake Erie to Tonawanda; and the rail road company, in December, altered the line of their track, as above stated, in aid of that enterprise.

It was proved, also, that many pieces of land, taken and used for the said rail road, were purchased and the title thereto actually received, in Genesee county, after the plaintiff's mortgage was recorded in that county. And that five pieces or parcels of land purchased at Batavia, in that county, were never used or occupied for rail road purposes.

The defendants Hinds, Otis and Worthington claimed that their respective judgments were liens upon all the lands of the rail road company acquired after the plaintiff's mortgage was recorded, and particularly upon the lands taken for the branch or side track at Tonawanda, and upon the lands not taken, acquired or used for rail road purposes at Batavia and other places, contiguous to said rail road, within said counties, through which the same passes. To show that the branch road or track aforesaid was contemplated by the company before the giving of the first mortgage, the plaintiff's counsel presented a report, made by the president of the said company, printed in 1851, but otherwise without date. This report contained a general description of the corporation and its franchises; the project for the road; the supposed cost; the length of road; the cost of depots and machinery; its relation to other rail roads; and its prospects of business and income, were given. In this report it was stated that the road would be "the shortest route between New York city and Tonawanda, the best harbor on Lake Erie." In another part of the report was the following statement: "The harbor of Tonawanda is probably the best on Lake Erie, and is far safer and more capacious than that of Buf-

falo. A thriving town has grown up at this point, which bids fair, at no distant day, to become a place of great importance, if not, indeed, the center of the lake trade. The imports of Tonawanda, in the year 1851, amounted in value to nearly $100,000, and its progress of late has been more rapid than that of any town on the lake. *At this point the Canandaigua and Niagara Falls road will receive the traffic of the lake, while at Niagara it will receive that of the land route.*"

*C. N. Potter*, for the plaintiffs. I. The corporation had power to make a mortgage. (1.) The power was absolutely essential to the construction of the road, which was the object of the corporation, and was therefore a necessary incident to its rights. The necessity of making the mortgage to this end is admitted. And corporations have power, independent of express authority, to mortgage when necessary for the purposes of the corporation. (2 *Kent's Com.* 281). (2.) The power was also specially given by statute. (*Gen. Rail Road Act, of* 1850, *Laws of* 1850, *p.* 211.) (3.) The power to make the mortgage is admitted by the plaintiffs, in their complaint.

II. The plaintiff Seymour's mortgage is a valid lien, as well upon all the real property acquired by the company since its execution, as upon that then acquired. (1.) The mortgage covers this after acquired real estate in the broadest terms. (2.) Mortgages of things "*not in esse*" are upheld in equity. This has long been settled in England. (1 *Powell on Mort.* 190. 2 *Crabb's Law of Real Estate,* 579. *Coote on Mort. Law Lib. ed.* 185. *Fisher on Mort. Law Lib. ed.* 249. *Seabourn* v. *Powell,* 1 *Vernon* 13. *Doe, ex dem. Gibson* v. *Pott,* 2 *Doug.* 710. *Noel* v. *Burley,* 3 *Sim.* 103. *Ex parte Colton,* 6 *Eng. J. R.* 1045. *Metcalf* v. *Archbishop of York,* 1 *Myl. & Cr.* 553. *Langton* v. *Horton,* 1 *Hare,* 539.) And it is settled in this state. (*Matter of Howe,* 1 *Paige,* 128, 129. *White* v. *Carpenter,* 2 *id.* 217. *Ellis* v. *Tousley,* 1 *Paige,* 283. *Field* v. *Mayor &c. of New York,* 2 *Selden,* 186, 187.) And in other states of the union. (*Mitchell* v.

*Winslow,* 2 *Story,* 630. 1 *Hilliard on Mort.* § 24.) And the cases to the contrary, both in this country and in England, are all actions *at law* and decided on that ground. These cases are three ; *Lunn* v. *Thornton,* (1 *Man., Gr. & Scott,* 370.) *Jones* v. *Richardson,* (10 *Metcalf,* 481.) *Otis* v. *Sill,* (8 *Barb.* 102.) All the authorities on that side are there reviewed. These cases all proceed on the naked common law ground that a man cannot mortgage what he does not own, or what does not exist. And all recognize the equitable distinction we insist on. (3.) And the covenant to give a mortgage on the subsequently acquired property was equivalent to a mortgage thereon ; except as to purchasers without notice. (*Fletcher* v. *Manning,* 2 *Story,* 555. *Pie* v. *Danbury* 3 *Brown's C. C.* 595. *Burn* v. *Burn,* 3 *Ves. jun.* 576. *Metcalf* v. *Archbishop of York,* 1 *Myl. & Cr.* 553. *Robertson* v. *Morton,* 1 *Drury & Warren,* 195.)

III. A lien by judgment is always subordinate to a prior equitable lien, whether of record or not, or executed or not. (*Finch* v. *Earl of Winchelsea,* 1 *P. Wms.* 277. *Burgh* v. *Franciss,* 5 *Bac. Abr.* 41. *Coote on Mort.* 185. *Willard's Eq. Jur.* 443, 444. *Langton* v. *Horton,* 1 *Hare,* 549. *Whitworth* v. *Gangain,* 3 *Hare,* 465. *Ellis* v. *Tousley,* 1 *Paige,* 284. *Dwight* v. *Newell,* 3 *Comst.* 187. *Moyer* v. *Hinman,* 3 *Ker.* 188.)

IV. The defendants are *estopped* from denying our lien. The judgment creditor can never claim more than the judgment debtor could, and is estopped by the same matters. (1.) And the judgment debtor, (the company,) could claim nothing against this mortgage. Independent of any covenant, the mortgagor is estopped. (2 *Crabb's Law of Real Estate,* 579. 30 *Law Lib.* 44, § 2216.) As to what a mortgagor *may not* do ; in the first place, he cannot dispute the mortgagee's title, for he made the mortgage, and no one shall be permitted to dispute a solemn deed under his own hand. (*Goodtitle* v. *Brady, Cowper,* 597. *Per Spencer Ch. J., Jackson* v. *Stevens,* 16 *John.* 115 *Vanderheyden* v. *Crandall,* 2 *Denio,* 25.) Here the mortgagors are especially estopped by their covenant, which is very full ; and by their acts. The property claimed by the defend-

ant was conveyed to the company on the 22d of April, 1853, yet on the 1st of August, 1853, and again on the 1st of December, 1853, before the defendants' judgments were recovered, the company mortgaged all their property including these parcels; and both mortgages were made in terms fully subject, as to all the real estate covered by them, to the plaintiffs' mortgage. (2.) This estoppel reaches to the defendants claiming under the judgment debtor. (*Jackson* v. *Parkhurst*, 9 *Wend.* 209. *Cowen* v. *Jackson*, 4 *Peters*, 83. *Crane* v. *Morris' Lessee*, 6 *id.* 598. *Bank of Utica* v. *Mersereau*, 3 *Barb. Ch. Rep.* 569. *Douglass* v. *Scott*, 5 *Ohio Rep.* 198. *Dunham* v. *Dey*, 15 *John.* 555. *Howard Ins. Co.* v. *Halsey*, 4 *Selden*, 274.)

V. The plaintiffs' mortgage is in the nature of a loan for consideration money. It was given to secure a loan to enable the company to construct the road, and the company covenanted to apply it to that end.

VI. But even if the power to bind their land to be acquired did not otherwise exist, it was given the company by their charter. (1.) The terms of the charter show this. The company had power to mortgage their property for the necessary purposes of the corporation, independent of any positive law. (4 *Kent's Com.* 281.) The power to mortgage their property as their purposes should require, was given by the revised statutes. (1 *R. S.* 600.) But the charter of the company went further. Its language is that every corporation formed thereunder shall in *addition* to the powers given by the revised statutes "have power from time to time to borrow such sums of money as may be necessary for completing and finishing or operating their rail road, and to issue and dispose of their bonds for any amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debts contracted by the company for the purposes aforesaid." (*Laws of* 1850, *p.* 211, § 28, *sub.* 10.) But the franchises of a corporation include all its rights, privileges and possibilities. Authority to mortgage all the property and franchises of a corporation was authority to mortgage the corporation as an entity with all property acquired and to be acquired. Indeed the whole frame of

the act, the necessities of the case and the object of the corporation, require that the road should be treated as an entity. The object of a rail road is to convey passengers and goods between given termini for the public convenience. The convenience of the public being the paramount object, no hypothecations are permitted in England which will interfere with its operation, nor can the rails there be taken up. (*Macon R. R. Co.* v. *Parker,* 9 *Ga. Rep.* 377.) (2.) Authority to borrow money *to construct* the road and secure the money by mortgage of the company's *property* and *franchises,* surely means authority to pledge the property acquired by the loan; or the law is an utter mockery. (3.) And that the legislature meant this is clear from the purpose of the act, the necessities of the case, and the course of legislation. The purpose of the act was to promote internal improvement. These improvements could not be made without loans of money in advance from various individuals. These loans could not be procured except by pledging the future estate. There is nothing inequitable, or against public policy, in sanctioning such a pledge, but the contrary. Hence such securities were proper and necessary to carry out the purpose of the legislature. And the whole course of legislation shows this. 1. The number of special charters granted. 2. The enactment of the general law of 1848. (*Laws of* 1848, *ch.* 140.) 3. The enactment of the much more liberal law of 1850. (*Laws of* 1850, *ch.* 140.) 4. The enactment of April 15, 1854. (*Laws of* 1854, *ch.* 282, *latter part* § 5.) 5. The consolidation act. 6. The act of April, 1857. (*Laws of* 1857, *ch.* 44.)

VII. The spirit of the age, public policy, and common justice requires such mortgages, in the case of rail roads, should be sustained. (1.) *Equitable liens* are favored both by the legislature and the courts. This is shown by the course of legislation in regard to rail roads, and other improvements, mechanics' liens, warehouse claims and the like. (2.) And the *uniform practice* of the rail roads has been to make such mortgages. Not to sustain them, would be to injure the credit of the coun-

try, and to work the most general and serious injury to creditors, and to deter future public improvements.

VIII. The particular question at issue has been settled, and is not open for discussion. (1.) By the uniform practice of the rail roads. (2.) By the decision of other states. ( *Willinck* v. *Morris Canal Co.,* 3 *Green,* 398. *Pierce* v. *Emery, N. H. Sup. Ct., June* 1856. And (3.) by the decisions of this district. ( *Stevens* v. *Buffalo and Corning R. R. Co., per Johnson, J., MS.*)

IX. The case of these defendants does not differ from that of any other judgment creditor. (1.) If Hinds' services give him any specific lien, he should have availed himself of the statute giving such lien. Having brought a simple action of assumpsit against the rail road company, all his claims became merged in the judgment. And he never had any equitable claim superior to the plaintiffs'. His advances were made for no more beneficial purpose ; were made on no pledge of any thing ; were advanced with full notice of our advance, and of the pledge of the *very property* he now claims. How then can *a subsequent advance* (no matter how meritorious,) give more than a subsequent lien ? (2.) To say that the lots at Batavia were not purchased for rail road purposes, is absurd. They have been so used ever since the organization of the company. The defendants having conveyed it, and taken the price, are estopped from denying this. And such are the admissions of the pleadings. Besides, if the property was the company's, it is covered by the mortgage. If not, then the defendant can have no lien upon it.

*S. E. Church,* for the defendant Hinds, insisted, *First.* That Hinds was entitled to have his judgment paid out of the proceeds of the lands acquired by the company subsequently to the execution of the plaintiffs' mortgage ; or to have the value of those lands ascertained and applied to his judgment, and costs ; and especially that the " branch road," at Tonawanda, was not included in the plaintiffs' mortgage. *Second.* That the lien of the judgment of Hinds was a superior equity to the

Seymour *v.* Canandaigua and Niagara Falls R. R. Co.

plaintiffs' claim, under their mortgage, to the lands and premises conveyed to the company by Hinds and others, on which the docks were constructed. To sustain these propositions he presented the following points.

I. At *law* a mortgage of property to be acquired *in futuro* is void. (*Right* v. *Bucknell*, 2 *Barn. & Adol.* 278. *Bacon's Abr. tit. Grants D*, 2. *Perkins, tit. Grant*, 65. *Fremoult* v. *Dedire*, 1 *P. Wms.* 429, *n.* 1. *Fonb. B.* 1, *ch.* 4, § 2, *pp.* 215, 216, *and notes J. and K. Gilbert on Uses*, 116, 117. *Jones* v. *Roe*, 3 *Tenn. R.* 88. *Shep. Touch. tit. Grant*, 241. *Williams* v. *Lucas*, 2 *Cox Cas.* 160. 2 *Roll. Abr. tit. Grant*, (*W.*) *pl.* 4 *and* 5. *Comyn's Dig. D. E.* 14. *Winslow* v. *Merchants' Ins. Co.*, 4 *Metc.* 306. *Otis* v. *Sill*, 8 *Barb.* 102. 2 *Cushing*, 204.) And this is true of property contemplated to be acquired at the time of the giving the mortgage. (4 *Metc.* 306.) Such a mortgage is only a declaration precedent, which, unlike a grant, is countermandable, and requires, in order to be effective as a lien, " some new act or conveyance to give life or vigor to the declaration precedent." (8 *Barb.* 113. *Bacon's Maxims, Reg.* 14.)

II. No *specific lien* is created by this mortgage which can be enforced, even in equity, upon the subsequently acquired lands of the company, constituting the branch track to the Niagara river at Tonawanda. (1.) These lands constituted no part of the rail road ' constructed or to be constructed," at the time of the execution of the mortgage. 'At that time this track was not even contemplated or thought of. It was not at all necessary for the purposes for which the road was built. It was a new project, set on foot after the mortgage was given, and was projected for a purpose foreign to the original objects of the road. It did not constitute any part of the property upon which the credit was given by the plaintiffs, or upon which they loaned their money. (2.) And the general language of the grant, conveying all the real estate "*which shall hereafter be owned*," does not create a *specific lien* upon any particular after acquired property. Such a lien can only be enforced when the mortgage describes the particular lands ; otherwise the grant

is inoperative, as well in equity as law. (*Otis* v. *Sill*, 8 *Barb.*
118. *Story's Eq.* 1249. *Williams* v. *Lucas*, 2 *Cox Cas.*
160.) It is good only as an executory contract binding on the
mortgagor personally. (*Rogers* v. *Hosack's Ex'rs*, 18 *Wend.*
319. 8 *Barb.* 118. *Stokes* v. *Holden*, 1 *Keen*, 152. *Pen-
don* v. *Jackson*, 1 *Russ.* 1, 26, 44 *to* 50. *Carlton* v. *Leighton*,
3 *Meriv.* 667, 672. 1 *Powell on Mortg.* 17, 18, 23. *Mestaer*
v. *Gillespie*, 11 *Ves.* 635. *Fonb. Eq. B.* 1, *ch.* 5, § 7. *Story's
Eq.* § 1249. *Winslow* v. *Merchants' Ins. Co.*, 4 *Metc.* 316.
*Jones* v. *Richardson*, 10 *id.* 481. 1 *Parsons on Cont.* 452,
454. 2 *Edw. Ch. Rep.* 442.) The most that can be claimed
is that the lands within the bounds of the route as mapped
and designated, or within the bounds of the changed line of the
same route, carrying out though altering the originally contem-
plated road, are within the description contained in the mort-
gage. A branch road, not originally contemplated, the title to
which was acquired after the execution of the mortgage, cannot
be said to be "particularly described in the mortgage," in any
legal sense whatever. The general words used, such as "rail-
ways, rails, bridges, real estate," &c., cannot be regarded as a
particular description of the branch, any more than the words
"all farms and real estate" can be said to describe lands and
farms acquired after the execution of a mortgage in other cases.
Suppose this company had extended a branch to Buffalo, or
Rochester, could there be any pretense for saying that they
were included within the description? Or suppose this com-
pany had purchased, after the construction of their road, another
line, the Canandaigua and Elmira Rail Road, it is very clear
that the plaintiffs' mortgage would not be a specific lien upon it;
and yet it would be clearly within the *general terms* used in
the mortgage, and it would be only a branch. If in these cases
the idea of a *specific lien* would be excluded, why not in case
of a branch road, not contemplated nor acquired until long after
the mortgage was given—not necessary or essential to the oper-
ation of the road, nor in fact intended to be mortgaged; valua-
ble to it as a feeder, but not an essential portion of the road
itself.

Seymour *v.* Canandaigua and Niagara Falls R. R. Co.

III. But if the plaintiffs ask the court to enforce an equitable lien on the branch road, and docks on the Niagara river, they should be held to do equity to the defendant Hinds. So far as relates to the lands conveyed in 1853, by Hinds and others, to the company, (on which the docks and a large share of this branch are constructed,) the plaintiffs cannot allege that their money purchased the lands or constructed the docks. The lands were paid for by the stock of the company. The defendant Hinds, by the expenditure of his labor, money and materials, has created the docks, which alone give value to the branch, and the lands on which the docks are situate. His judgment was recovered for this expenditure. As against a lien equitable in its character, but void at law, and which a court of equity is asked to make specific, the amount thus expended to enhance the value of the property should be regarded, as between the plaintiffs and Hinds, as analogous to unpaid purchase money, which they should be held to discharge before taking the docks, &c., under their mortgage. If the purchase price of the land itself remained unpaid, the equitable lien for that would be held superior to the plaintiffs' equity. Why should not the same rule apply as against an equity which seeks to sweep away the property of the defendant to the amount of $12,000, and all the franchises, rights and other property of the company, leaving him utterly remediless?

Again; it is submitted that it is against public policy to extend equitable liens in favor of mortgagees of rail roads, under general words. The public, who deal with these corporations, have no means of knowing what is, and what is not, intended to be conveyed, and it is extremely unjust to creditors dealing upon the faith of apparent ownership of property to be cut off by such indefinable equities. Between individuals, a mortgage conveying all real estate which the mortgagor might acquire subsequent to the mortgage, would be regarded as a fraud, *per se,* upon subsequent creditors; and there is no reason for show ing favor in this class of cases. It is better, both for the pub lic and lenders of money, that the line should be marked between what can and what cannot be held.

*M. Taggart,* for the defendants Otis and Worthington. I. The mortgage is not a lien or incumbrance upon lands the title to which was acquired by the company after its execution and delivery. As regards these lands the lien of the judgment is to be preferred. (*Right* v. *Bucknell,* 2 *Barn. & Adol.* 274. 22 *Eng. Com. Law Rep.* 73.)

II. The corporation exceeded the power conferred upon it, in mortgaging property to be afterwards acquired; and the mortgage is for that reason inoperative and void, *pro tanto.* The complaint alleges that the corporation had power " to mortgage its corporate property and franchises to secure the payment of any debt contracted by it," &c. No power is conferred to mortgage property or franchises thereafter to be acquired. Hence the resolution of the company, authorizing the mortgage, so far as it purports to authorize a mortgage of property that might thereafter be acquired, was inoperative and void. So as to the rights and privileges of the company " *to be owned.*" So also the mortgage of lands " thereafter to be owned" by the company, and also of lands thereafter " to be used and occupied," is null and void.

III. The covenant for further assurance can have no effect, unless such further assurance were executed and delivered before the defendants' lien attached. (*Shep. Touch.* 167. 4*th Cruise's Dig.* 464.)

IV. So far as relates to lands not used for rail road purposes, the plaintiffs have no lien either legally or equitably. It could not have been contemplated by either party that the corporation was to enter into land speculations, and buy lands not necessary and proper for its corporate purposes, and subject such lands to the lien of the mortgage. The defendants, Otis and Worthington, therefore, claim that they are entitled, 1st. To have their judgment and costs paid out of the proceeds of the sale of the lands acquired subsequently to the making of the mortgage ; and for that purpose these lands should be separately sold, unless it is conceded that they are sufficient in amount, and sufficient money be brought into court to pay their claim. 2d. They should at all events 'secure the proceeds of

the sale of the lands subsequently acquired and not used for
rail road purposes ; and for that purpose these lands should be
separately sold, and the proceeds brought into court.

V. The company had a title to certain lands which were capa-
ble of being mortgaged, and were mortgaged by the same in-
strument or deed which, it is now claimed, also mortgaged land
not then owned by the company. There was therefore some-
thing for the mortgage to operate upon at *the time* it was exe-
cuted, and it could take effect but once. It is only when the
grantor or mortgagor owns no title upon which the instrument
can operate *at the time*, that an after acquired title enures to
the benefit of the grantee or mortgagee, by way of estoppel.
"If any interest, however small, passes by a deed, it creates no
estoppel. (4 *Kent's Com.* 97, 98, 99, *6th ed.*) But in this
case there could be no estoppel, for another reason. The
mortgage disclosed the fact that the mortgagor had no title to the
lands now in question, but undertook to convey by way of mort-
gage, lands to which both parties knew the mortgagor had no
title at the time. It is only where the deed or mortgage *as-
sumes* that the grantor or mortgagor owns the lands con-
veyed, and the grantee or mortgagee takes the deed or
mortgage *believing* that the grantor or mortgagor then owned
such lands, that the doctrine of estoppel applies at all. The
only possible principle on which the mortgage bond could oper-
ate in respect to after acquired property, is that as to such
property, the mortgage bond is not a mortgage, but an *agree-
ment* to mortgage. Now, although an unrecorded mortgage
has precedence over a judgment subsequently docketed, there
is no principle upon which a mere unrecorded agreement to
mortgage can prevail against a judgment docketed before the
mortgage itself is in fact executed. The lien of the judgment
is a *legal right* which must prevail over such an unrecorded
agreement.

VI. The mortgage should intelligibly refer to, or describe,
the lands. A general mortgage of all the lands thereafter to
be acquired, will not be sustained. (*Field* v. *Mayor &c. of
New York*, 2 *Selden*, 179.)

E. DARWIN SMITH, J.   It does not appear at what precise time the bonds, mentioned in the mortgage described in the complaint in this action, were actually issued to bona fide holders, or at what time the money borrowed thereon was in fact advanced.   The mortgage was made to secure these bonds, which were to be issued to such persons as should be found thereafter willing to advance their money upon such security. Seymour and Coe, the mortgagees named in the mortgage, were mere trustees for these bondholders.   They did not, at the time of the making and execution of the mortgage, make any advance to the rail road company thereon, and were obviously not expected to do so.   The bonds were payable in London, and of different sums or amounts ; some were for two, some for five hundred, and some for one thousand pounds sterling, and all were to be countersigned by an agent of the rail road company in London.   It is apparent, therefore, upon the face of the transaction, that there was no actual consideration for this mortgage given or advanced in this country, and that it was made and designed purely as a security for money to be borrowed in England.   The mortgage and the bonds bear date March 17th, 1852, but in view of the fact that they were thus obviously made to be used abroad, and in the absence of any proof when the money secured thereby was actually advanced, I think it must be considered that the mortgage was inoperative till it was put upon record in the several counties through which the rail road was designed to pass.   It is not to be presumed that persons going to advance money, on these bonds, would be likely to do so until they had evidence that the mortgage was duly recorded so as to secure to this mortgage priority of lien over any other creditor of the corporation.   The mortgage was recorded in Ontario county, May 3d, 1852, and in the other counties within a day or two thereafter, except in Genesee, where it was recorded on the 10th of June following.   At the time when the mortgage was thus put upon record, it doubtless took effect as a valid mortgage, at law, in behalf of all persons who then had made advances, or should thereafter make advances upon these bonds or any of them.   As a legal instrument of

conveyance it was then. notice to all the world, and was valid and operative to bind all the property and franchises then owned by the corporation embraced within its terms and description. So far as relates to property then acquired, this is not disputed and is indisputable.

The chief question in controversy relates to the property of the rail road company not then owned or acquired by it. When the mortgage was first put on record, May 3d, 1852, it does not appear how far, or to what extent, the rail road company had acquired the right of way for the rail road. They obviously commenced the work of constructing the road at Canandaigua, its eastern terminus, and worked westward, for it appears it was completed and put in operation from Canandaigua to Batavia by the 1st of January, 1853, and from that point to the suspension bridge, at Niagara, on the 1st of July following, and there is no proof that the right of way was not all acquired up to the east line of Genesee county, at the time of recording the mortgage. In Genesee, Erie and Niagara counties, confessedly, much of the right of way was acquired after the mortgage was recorded in those counties respectively. Upon all such lands clearly the plaintiffs' mortgage was not and is not a valid lien *at law.* It is a fundamental maxim of the common law, that a man cannot *grant* or *convey* what he does not own. (*Perkins, tit. Grant,* § 65. *Noy's Maxims,* 62. *Bacon's Maxims, reg.* 14.) In giving the mortgage, the rail road company did not profess to own or to mortgage the whole right of way for the rail road. They granted " all and singular the railways, rails, bridges, fences, privileges, rights and real estate now owned by the said company, or which shall hereafter be owned by them, and all lands used and occupied, or which may hereafter be used and occupied for railways, depots or stations, with all buildings erected, or which may be hereafter erected thereon." Here was a distinct notice that there were lands yet to be acquired, and buildings yet to be erected. The mortgage contains a covenant that the money loaned shall be used in constructing the rail road. The rail road company, therefore, did not profess to mortgage the road as complete, or with a title to

the lands required for its use as acquired. There is therefore no question of estoppel in the case, at law, as against the rail road company itself. But the plaintiffs claim that their mortgage is a valid lien, in equity, upon the subsequently acquired property. It is not denied by the learned counsel for the defendants that such a lien may exist which courts of equity may sustain and enforce in many cases where there is no relief at law, but it is insisted that this is not a case of equitable mortgage, and that the rights of the defendants as judgment creditors, are superior to any equities of the plaintiffs in respect to these subsequently acquired lands.

Courts of equity, though unembarrassed by the strict and technical rules of the common law, do not administer justice except in conformity with settled principles. It is the province and duty of such courts to relieve against defects and imperfections at law in the making of contracts. Regarding all just and honest contracts as binding in conscience and equity, they seek to give to them full effect and operation, according to the real intention of the contracting parties. Upon this principle they enforce the specific execution of contracts and give relief in numerous cases of agreements relating to lands, and things in action, and contingent interests or expectancies, upon the maxim that equity considers that done which being distinctly agreed to be done, ought to have been done. (*Grounds and Rudiments of Law and Equity*, 75.) Upon this principle, when it is expressly agreed to give a lien upon lands, courts of equity have long held that such agreement was to be treated and considered as giving a specific lien upon the land. The learned counsel for the defendants concede this to be so, and contend that the rule was rightly stated in *Fonblanque*, b. 1, ch. 5, § 8, and in the cases reported in 1 *Peere Williams*, pp. 282, 429. Fonblanque states the rule thus: "A covenant to settle or convey particular lands will not, at law, create a lien upon the lands, but in equity such a covenant, if for a valuable consideration, will be deemed a specific lien on the lands, and decreed against all persons claiming under the covenanter except purchasers for a valuable consideration, and without notice

Seymour *v.* Canandaigua and Niagara Falls R. R. Co.

of such covenant," and refers to *Coventry* v. *Coventry*, reported at the end of *Francis' Maxims*. Fonblanque also says, (*B.* 1, *ch.* 4, § 2,) "So although a grant of a possibility is not good at law, yet a possibility, or a trust in equity may be assigned. So a covenant to settle lands, of which he has only a possibility of descent, shall be carried into execution in equity, for the court does not bind the interest, but instead of damages, enforces the performance in specie." Chancellor Walworth, in the *Matter of Howe*, (1 *Paige*, 129,) and in *White* v. *Carpenter*, (2 *id.* 266,) affirms this principle, and in *Howe's case* he refers to most of the English cases holding this doctrine, with approval, and cites quite a number of American cases, from other states, to the same effect.

The counsel for the defendant Hinds, however, among other cases cited and commended to my particular attention on this point, the case of *Otis* v. *Sill*, (8 *Barb.* 102.) This was a case at law. The only question raised and decided was, whether at law a chattel mortgage bound property not in esse at the time of its execution. The mortgagor professed to sell and assign to the plaintiff not only all the scythes, iron, steel and coal then owned and possessed by him, but also all scythes, iron, steel and coal which might be purchased in lieu of the aforesaid property. The court, in that case, held that a chattel mortgage could not operate at law on property not in actual existence at the time of its execution. The decision was clearly right. (1 *Man. Gran. & Scott*, 379.) The learned judge who gave the opinion of the court, it is true, in the course of his opinion, discussed at some length the question whether the mortgage was valid in equity, but concluded that the pleadings did not raise that question so that relief could be given in equity, and the case was decided as purely one of law; and although the learned judge doubted whether the rule in equity in respect to mortgages or contracts for a lien upon subsequently acquired property applied to that case, and considered that Judge Story had carried the doctrine too far in the case of *Mitchell* v. *Winslow*, (2 *Story*, 630,) yet he assents to the rule so stated above in Fonblanque, and by the Chancellor.

He says, page 129, " The agreement to execute a mortgage on particular lands described in the agreement, is doubtless, in equity, a specific lien on the land, and will be preferred to subsequent judgment creditors."

The rule as here stated, that the mortgage or agreement must refer to particular lands, is doubtless the true one. It was so laid down in the leading case of *Fremoult* v. *Dedire*, (1 *Peere Williams*, 430.) In this case, Dedire had covenanted to settle his lands in Rumney Marsh, and also other lands that should be of the value of £60, upon his wife for her life. The lord chancellor held, that with regard to the lands in Rumney Marsh, the marriage articles created a specific lien upon them, but the covenant for settling lands of the value of $60 per annum, did not specifically bind any lands. The same obvious distinction runs through all the cases. When the agreement would be void, for uncertainty, in not describing, or designating plainly, any lands or property, no lien can attach. A lien must have a specific reference. It must necessarily apply to some designated property, either in esse or expectancy, and this clearly and unmistakeably. Unless the agreement, or mortgage plainly describes or designates particular lands, it must be regarded as a mere executory contract, and enforceable only as such. ( *Winslow* v. *Merchants' Insurance Co.*, 4 *Met.* 306.) And it must clearly appear too, that it was the intention of the parties, in any covenant or agreement, to give a lien upon the property. (*Rogers* v. *Hosack's Executors*, 18 *Wend.* 319.) In this last case, referred to by Judge Paige, in *Otis* v. *Sill*, the covenant was to pay the balance of a debt from a certain fund. This was held to create no lien upon the fund, and to be a mere executory agreement. Judge Cowen (p. 334) says, " Here is no assignment, no mortgage, or pledge, no order, or any other specific appropriation of the French funds, but a mere covenant to pay them over on their being obtained by the covenantee." Senator Dickinson also speaking of another fund, says, " The English claim is disposed of by words of assignment and transfer. Can it be possible then, that with an intention to create a specific lien or equitable mortgage upon the

French fund, the parties should have left this large fund to the caprice of implications?" In both these opinions the rule is clearly recognized that an agreement for a lien is a lien in equity, when it is clear that it was the intention to give, or create such lien. In the case of *Otis* v. *Sill*, however, the learned judge says, of these cases of assignments, or mortgages of property, to be acquired *in futuro*, " If such an assignment of property, to be acquired, is valid in equity, it is only valid as a contract to assign, when the property shall be acquired, not as an assignment of a present interest in the property ; and if it is enforced in equity, it can only be enforced as a right under the contract, and not as a trust attached to the property." If the learned judge means by this, that a sale, assignment or mortgage of property not in esse, or of contingent interests, or expectancies, confers no title or interest in the thing, *in presenti*, that is self evident. But if it is meant that the sale or assignment of such property, to be acquired *in futuro*, or of contingent interests, or expectancies, rests in contract merely till some new assurance, and does not attach, as a lien, or charge, as soon as the property is acquired, or has a substantial existence, I cannot agree with him. As soon as the property is acquired, or comes into existence, the lien in or upon it attaches. They come into being together and coexist. Equity executes the contract by holding that what is agreed to be done is done. That the right to the lien creates the lien. ( *Wright* v. *Wright*, 1 *Vesey*, 409, 410.)

Judge Story, in *Mitchell* v. *Winslow*, (2 *Story*, 644,) states the rule with great clearness, as follows : " It seems to me a clear result of all the authorities, that whenever the parties, by their contract, intend to create a positive lien or charge, either upon real or personal property, whether then owned by the assignor or contractor, or not, or if personal property, whether it it is then in being or not, it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto against the latter, and all persons asserting a claim thereto under him, either voluntarily, or with notice or in bankruptcy." The same doctrine is also

asserted, in substance, by Vice Chancellor Wigram, in *Langton* v. *Horton*, (1 *Hare*, 549,) in an opinion of great clearness and ability; and in 1 *Jac. & W.* 526 ; 4 *Simons*, 624. An assignment of that which is expected to be the fruit of an undertaking already commenced, of possibilities coupled with an interest, or of a thing which, in the ordinary course of events, will exist at a future time, is valid in equity, (1 *Myl. & K.* 488 ; 6 *Simons*, 414, 224 ; 8 *Price*, 269,) but not a mere naked possibility, and not an interest incapable of being made the subject of a contract. (4 *Kent*, 144.) These cases, and this view of the rule in equity, in respect to the assignments of future interests or possibilites, is clearly sustained and affirmed in the opinion of Judge Welles, in *Field* v. *The Mayor of New York*, (2 *Selden*, 186.)

Considering, therefore, the rule in equity to be, that a grant of particular lands, to be acquired *in futuro*, is valid, and takes effect as a specific lien upon the lands as soon as they are acquired, it remains to apply the principle to the facts of this case. Upon the evidence, I think that I am to assume that the line of this railway, from Canandaigua to Suspension Bridge, was located before the mortgage was put on record in any county. It is true that it was afterwards altered in Erie and Niagara counties, but that, I think, does not affect the question I am now considering. The rail road company, by the 28th section of the general rail road act, which must be deemed a part of its charter, and to be part of the contract with the plaintiffs, (whose rights may be considered as acquired under it and governed by it,) was authorized to enter upon the lands and waters of any person, for the purpose of making examination and survey of its proposed road. And by section 22, the corporation was required to file a map or profile of the route of its intended road, duly certified, in every county named in its articles of association, before proceeding to construct any part of its road in such county. In addition to this map, the corporation was, by section 14, required to file a certificate of location in conformity with such map, signed by a majority of the directors, in and by which map and certificate, the line of the said rail road is to be

designated and located. Upon the line thus fixed or located, the rail road company was entitled, by subdivision 4 of said section 28, "To lay out its road, not exceeding six rods in width, and for the purpose of cuttings and embankments, to take as much more land as may be necessary for the proper construction and security of the road." On the route of the proposed rail road of the company from Canandaigua to Niagara Falls, immediately upon the location of such road, in manner aforesaid, a strip of land six rods in width, was laid out and designated for the road of this company, of which it was entitled to take so much as it required for the use of the rail road, on making due compensation therefor. The company had, in effect, by its charter, a patent from the state to enter upon and appropriate such strip of land to its own use so soon as it had made due compensation therefor. Its right was absolute, subject only to that single reservation or condition, and the strip of land is clearly defined and designated by law. This strip of land is the land referred to in the plaintiffs' mortgage, with sufficient particularity and definiteness to answer the rule in equity. This strip of land is *particular land*, in the language and sense of the rule in equity, as laid down in the case in Peere Williams and by Fonblanque. The description in the mortgage, of the land acquired, and to be acquired, must be deemed to refer to the charter, and the law defines the land which the mortgage is designed to cover, and the lien of the mortgage clearly attached to such unacquired land so soon as the title thereto passed to the corporation. But if the rule be as some of the cases hold, that a disposition by deed, or mortgage, or assignment, of after acquired property, while it is inoperative as a conveyance of the title, may be considered as a declaration precedent, which will derive its effects from some new act of the party after the property is acquired, (*Bacon's Max. Reg.* 14. *Sumner* v. *Thurston*, 1 *Man., Gran. & Scott*, 379,) then certainly the two subsequent mortgages executed by the rail road company, one September 16th, 1853, and the other December, 1853, both after the road had been constructed and was in operation, and both containing an ex-

press reference to the plaintiffs' mortgage, and both expressly covering all this property, and subjecting it in terms to the prior lien of such mortgage, must be deemed a sufficient act of new or further assurance or ratification to satisfy the rule in question.

But I think this mortgage covers and embraces the subsequently acquired lands upon another and distinct ground, independent of the rule in equity above referred to. The statute, (*Gen. Rail Road Act, subd.* 10, § 28,) authorizes a rail road corporation, organized under such act, "from time to time, to borrow such sums of money as may be necessary for completing or finishing or operating their rail road, and to issue and dispose of their bonds for an amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company for the purpose aforesaid." The mortgage in this case was made in pursuance and by virtue of this statute, and is clearly authorized by it. The charter of the Niagara Falls Rail Road Company was itself a franchise, and it included a right to enter upon and take lands for this rail road, and to construct and operate the road. The right to enter upon and take the particular lands required for the purpose of the rail road, was included and embraced in the mortgage, and is clearly conveyed and bound by it. The legislature authorized the corporation to mortgage their "franchises, together with their corporate property." All the rights and interests of the corporation were included in these words. I think the legislature intended to give authority, by this statute, to rail road corporations to mortgage all and singular the property of the corporation, with all its franchises, rights and interests acquired, and to be acquired, as an *entirety*, and that the mortgage in this case is of the whole rail road, and of all the real property of the corporation, and its entire franchises, in as full and complete a manner as the corporation could possess, exercise and enjoy such rights and franchises. In this aspect of the question, it is therefore entirely immaterial whether the right of way for the rail road was all acquired or not, at the time the mortgage was put on record;

and it is equally immaterial whether the road had or had not been at that time entirely located, or the location thereof, if previously made, was afterwards changed. The right to change its location was one of the chartered privileges of the corporation, and was embraced within the grant of its franchises. So also was the right to take such lands as might be requisite to complete the road upon its original, or upon any altered line. This point was so held by my brother Johnson in the case of John A. Stevens and others *vs.* The Buffalo, Corning and New York Rail Road Company, tried before him at special term at Corning, in November, 1856, as appears from notes of his decision furnished me by counsel, no opinion having been written by the judge. The question has been decided in the same way by the supreme judicial court of New Hampshire, in the case of *Pierce and others* v. *Emery and others.* In that case the Portsmouth and Concord Rail Road Company, under an act of the legislature, had mortgaged its road to secure bonds to the amount of $350,000. The mortgage conveyed all the real and personal estate of the corporation, with all rights, franchises, powers and privileges. It was held that the mortgage covered the whole rail road, with all its corporate rights and franchises, as an entire thing, including subsequently acquired property. In the case of *Willinck* v. *The Morris Canal and Banking Co.,* (3 *Green's Ch. Rep.* 402,) in the court of chancery of New Jersey, the chancellor asserts the same doctrine. In that case, under an act of the legislature of New Jersey, the Morris Canal Company had mortgaged its canal, then in course of completion from the Delaware to the Hudson river, with all and singular its property and franchises. The question was, whether the mortgage covered the canal between Newark and Jersey City. The route had been surveyed, but the canal had not been excavated, or any of the lands purchased, till after the mortgage was given. The chancellor held that the mortgage embraced the entire canal and every thing connected with it, including feeders, wharves, docks and piers, and all other appendages.

The only remaining question to be now considered, relates to

the branch track from the, main track at Tonawanda to the Niagara river, or to the docks on the banks of the river. This branch was not laid out at the time of the original location of the road, and obviously was not then projected or contemplated, at least at the place where it is now located. But I think it is covered by the mortgage, as an incident to the principal subject of the grant, upon the maxim "that whoever grants a thing is supposed tacitly to grant that without which the grant itself would be of no effect." (*Broom's Legal Maxims*, 198. 11 *Rep.* 52.) When a thing is granted, all the means to attain it and all the fruits and effects of it, are granted also. (*Shep. Touch.* 89.) It is a rule of law, that the incident passes by the grant of the principal, (*Broom*, 205,) whatever is essential to the use and enjoyment of the principal thing. (4 *Kent*, 467.)

Now the rail road company, most obviously, contemplated meeting the business of Lake Erie at Tonawanda, and expected to derive a large revenue from that source. The report of the president of the company, made in 1851, speaks of Tonawanda as being the best harbor on Lake Erie, and goes into a calculation in respect to the amount of business that will come to the rail road at that point. In another place in the report, speaking of Tonawanda, it states, that "at this point the road will receive the traffic of the lake," and adds, that the imports of that harbor had amounted to nearly $100,000 in the year 1851, and describes the thriving village of Tonawanda in language well adapted, and doubtless designed, for a foreign market. But independently of this report and of all the evidence of a purpose or expectation on the part of the company to connect its road by a branch with the Niagara river at this point, the company had the undoubted right to do so, and what was so obviously for their interests the law will not presume they would be likely to overlook. Tonawanda was an important point on the line of their rail road, doubtless the most important point between Canandaigua and the suspension bridge at Niagara. Perhaps more important even than its terminus at the suspension bridge. At such a point it is not to be intended or supposed that the rail road company would not construct a branch to meet the

business designed for the rail road on the bank of the river, and make such erections and connections by branch and side tracks as should be adapted to facilitate and promote their convenience and interest in receiving freight from and delivering it to lake vessels in the harbor. The branch road is, therefore, in my opinion, a legitimate incident of the main road, as necessary or convenient for its use and enjoyment as side tracks, turnouts, woodyards, shops and engine houses, and it therefore passed with the grant of the rail road and its franchises, as an appurtenance—as a legitimate prospective incident to such road. But the rail road company being bound to make further assurance, and this branch having been constructed before the 2d and 3d mortgages were given, and before any of the judgments of the defendants were recovered, I think the plaintiffs can hold it under their mortgage by force of the new declaration or assurance contained in these mortgages, as they may hold upon the same principle, the lands purchased for depots and station houses and the like uses. The defendant Hinds sets up no equity that attaches to the right of way. The rail road company paid for the land on which the branch track is located, in its stock. The consideration for the judgment of the defendant Hinds is for labor, services and materials found in constructing such branch. He has no equity which can take priority over the plaintiffs' mortgage. As the plaintiffs have an equitable lien upon the rail road, its tracks and appurtenances, upon well settled principles, such lien must prevail over the lien of the judgment creditors. Courts of equity control judgments and enforce and protect the prior equitable title in preference to the judgment. (23 *Eng. Ch. Rep.* 561. 1 *Paige,* 284. 3 *Comstock,* 187. 3 *Kernan,* 188.)

But the equitable rights of the plaintiffs only extend to the particular lands designated by statute, and which the company was authorized to take, and did take, for the use of its road. The rail road company, in addition to the right to lay out its road not exceeding the width of six rods, and to take the land therefor, and as much more as should be necessary for cuttings and embankments, was also entitled by subdivision 3 of

section 28, "To purchase, hold and use all such real estate, and other property, as may be necessary for the construction and maintenance of its rail road and the stations and other accommodations necessary to accomplish the objects of its incorporation." Under this provision the company was authorized to purchase and hold such lands as were necessary for depots, stations, warehouses, woodyards, shops and other legitimate rail road purposes. All such lands, with the erections thereon, would pass to the complainants, under their mortgage, as part of the rail road, or as essential to its use and enjoyment. But lands acquired by the rail road company and not thus used or employed for rail road purposes, would not come within the description of the mortgage.

The particular lands which were to be acquired after the mortgage was put on record in the several counties through which the rail road passed, within the rule above stated, must necessarily be the lands designated by the statute for the rail road, and such as the company was authorized to acquire and take for its track and legitimate use, as above stated. These are embraced within the purview of the mortgage and nothing beyond. It is in proof that some of the lands purchased in Batavia have never been used for rail road purposes. That in some instances whole lots were purchased to secure a right of way across them. If the rail road company for this purpose had purchased a lot of ten or one hundred acres, it cannot be that any more of such lots would be embraced in this mortgage to the plaintiffs than was actually taken and required for the road. In respect to all such lands outside of the legal limits of their rail road track and branches, and excepting land used for shops, depots, stations, turnouts for wood or water, or other legitimate purposes, the lien of the defendants' judgments must prevail. The plaintiffs have no legal or equitable lien upon such lands, and the lands are liable therefore to the legal claims of the other creditors of the corporation. It is not in proof with sufficient distinctness, what lands were acquired by the company which, within the principle above stated, will not be covered by the plaintiffs' mortgage. It will, therefore,

be necessary, in such decree as shall be made, to direct a refer-
ence, to ascertain what lands were owned by the rail road com-
pany which are subject to the lien of the judgments of the de-
fendants, Hinds, Otis and Worthington, and to determine the
relative rights of the defendants in respect to such lands, as
among themselves; or to the proceeds of the lands, if the same
or any part thereof shall have been sold.

The plaintiffs are entitled to a decree for a foreclosure of
their mortgage for the amount due them, with costs, upon the
whole rail road, its track, franchises and depots, and all its real
property and appurtenances, upon the principles above stated.

