JOHN FISK, Respondent, *v.* ROBERT B. POTTER and others, Appellants.

The extent to which the secret, equitable and unrecorded lien of a vendor for unpaid purchase-money of lands sold and conveyed by him, exists as against other parties than the vendee, depends upon the facts and circumstances of each particular case.

It may be stated generally that such lien does not exist against purchasers under a conveyance of the legal estate, made *bona fide*, for a valuable consideration, without notice, if they have paid the purchase-money.

Facts and circumstances that will tend to establish an intent on the part of the vendor to waive the lien, or that will give preference to other liens acquired concurrently or subsequently—fully considered.

THIS action was brought to enforce an equitable lien for the purchase-money of land sold by the plaintiff, to the Canandaigua and Niagara Falls Railroad company.

The issues joined in the action were referred to a sole referee to hear and determine, who found, as facts, as follows:

That the defendant, the Canandaigua and Niagara Falls Railroad company, was and is a corporation duly formed and organized under the act of the legislature of this State, entitled "An act to authorize the formation of railroad corporations, and to regulate the same," passed April 2, 1850, and the acts amendatory thereof.

That on the 17th of March, 1852, said corporation executed their mortgage upon their railroad constructed and to be constructed, with all the railways, rails, bridges, fences, rights and real estate then owned by said corporation, *or which should thereafter be owned by them*, and all the tolls, incomes, issues and profits (whenever the corporation should be in default in making payment) to be had from the same, and all franchises of the corporation, and all lands used and occupied, or which might thereafter be used and occupied for railroads, depots or stations, with all buildings erected or which might thereafter be erected thereon ; which mortgage was made to secure the repayment of $1,000,000 and interest, to be borrowed by the company on their bonds to be issued

for $1,000 each, to be applied to the completion of the railroad the corporation was then constructing. The mortgage contained a covenant on the part of the corporation to use the money raised on the bonds in the construction of said railroad, and to execute such further assurances as should from time to time be necessary, and as the counsel of the trustees named in the mortgage should advise or require so as to embrace said railroad when complete, and all its property intended to be conveyed or acquired, and to be thereafter acquired. The mortgage was made to Isaac Seymour and George S. Coe, in trust for the holders of the bonds so to be issued, and its execution was duly proved or acknowledged, and it was recorded in Niagara county clerk's office, May 5, 1852.

That on the 9th day of November, 1852, the plaintiff, with three others, by deed dated that day, conveyed to said corporation the lands and premises described in the complaint, and being situated in the town and county of Niagara, and the corporation immediately thereafter took possession thereof, and directly contiguous thereto laid the track of their railroad, and the same have since been occupied for the uses and purposes of the railroad. The execution of the deed was acknowledged in November, 1852, by three of the grantors, and in December, by the fourth, and the deed was recorded in Niagara county clerk's office, July 21, 1857. The purchase price of the entire land and premises thus conveyed was $4,000, and the plaintiff at the time of the conveyance owned an undivided fifth part thereof, and to secure his proportion of the purchase price thereof, he took the promissory note of the corporation, dated November 9, 1852, signed "Geo. Wright, commissioner for the Canandaigua and Niagara Falls Railroad company," by which the corporation promised to pay to the plaintiff's order, two months after date, $800, for value received in land, with interest until paid; four shares in stock of the company, and $400 in cash, and took no other security, and the note remains wholly unpaid. The other grantors in the deed have been paid in full their proportion of the purchase price.

That in 1853 the corporation made two other mortgages on all the real estate then owned by them, one dated August 1, 1853, and to secure bonds to the amount of $750,000, and the other dated December 1, 1853, and to secure bonds to the amount of $600,000, and both were made expressly subject to the payment of the prior mortgage dated March 17, 1852.

That subsequently an action was commenced in this court t) foreclose the first mortgage, the corporation and the mortgagees in the two subsequent mortgages being made parties defendants, but Fisk, the plaintiff in this action, was not made a party thereto, and in March 27, 1857, judgment in that action was perfected, directing a sale of the mortgaged premises, including the land so conveyed by the plaintiff in this action, and his co-tenants, to the corporation, and foreclosing all the right and interest in the premises, of the defendants in that action. That, May 22, 1857, the said mortgaged premises were sold by a referee, under the judgment, and were bid off in the name of Robert B. Potter, one of the defendants in this action, on account of certain parties, a portion of whom held about five-eighths of the bonds, to secure the payment of which, the mortgage so foreclosed was made, and ten per cent of the bid was paid down in money and said bonds. That on the 6th day of November, 1857, the referee made his deed to said purchasers, pursuant to said sale under the judgment, at which time the remainder of the amount of the bid not previously paid, was paid in said bonds and money, payments having been made from time to time, between the time of the sale and the execution of the deed. That prior to the execution of the deed by the referee, and on the 21st of September, 1857, at which time a much larger amount of the purchase price of the mortgaged premises, on the sale by the referee, remained unpaid, than the amount now due on the plaintiff's said note, this action was commenced, and notice of the pendency thereof, setting forth the object of the action, with a description of the said land and premises, so conveyed by the plaintiff and others to the corporation, and setting forth the names of all the parties

to the action, together with a copy of the complaint, was filed in the office of the clerk of Niagara county.

That on the 2d day of January, 1855, the property and effects of the corporation were sequestered, and receiver thereof appointed, on the application of a creditor of the corporation, and that prior to that time the plaintiff demanded of the corporation the certificates for the said four shares of stock, and the said $400 and interest, and that the corporation wholly neglected to comply with the demand. And the said referee did further certify and report that he had computed and ascertained the amount due upon said promissory note, as given by said corporation to said plaintiff, and set out in the complaint in this action, not only as to and as against the defendants who have appeared and answered in this action, but also as to and against all other defendants therein, and that he did find the amount so due, including interest, to the date of said report, to be the sum of one thousand one hundred and sixty-seven dollars and thirty-eight cents ($1,167.38). And the said referee did further report:

"And as a conclusion of law from the foregoing facts, I do find and decide that the plaintiff, as against the defendants in this action, and all persons claiming under them, or any or either of them, since the commencement of the action, has an equitable lien upon the lands and premises described in the complaint (being an equal undivided fifth part of said lands and premises so conveyed by the plaintiff and his co-tenants to said corporation, as set forth in the complaint), for the amount so due upon said promissory note, and that the plaintiff is entitled to a judgment, directing and adjudging that said lands and premises, or so much thereof as may be sufficient to raise the amount so due to the plaintiff for principal and interest, with the costs of this action, and which may be sold separately, without material injury to the parties interested, be sold at public auction, in the county of Niagara, by or under the direction of the sheriff."

Upon this report judgment was perfected. An appeal was taken to the General Term of the eighth judicial district,

which affirmed the judgment, from which an appeal is brought to this court.

*Clarkson N. Potter*, for the appellants.

*F. E. Cornwell*, for the respondent.

Potter, J. This case calls for the determination of one of the nicest questions of the law of natural equity. The plaintiff claims an equitable lien upon certain premises for unpaid purchase-money. The defendants claim as purchasers under a foreclosure and sale of a mortgage, given to *bona fide* mortgagees. The facts and circumstances surrounding this case as connected with the claims of both parties are peculiar and unusual. They are an exception to and a departure from the ordinary dealings of parties making such claims, or defending against them. In the inquiry, therefore, whether the plaintiff's lien exists or did exist, and, if it did, whether the plaintiff did not waive it or allow a superior equity to come in to defeat it, calls for an examination into the effect and bearing of those peculiar circumstances which distinguish this case from all others, or at least from ordinary cases. It may be remarked that the law of equity which establishes the right of lien in the vendor for unpaid purchase-money of the lands sold to the vendee, is an anomaly in the law, and though it exists in certain cases, and perhaps we may say generally as between vendor and vendee, its existence depends upon and is controlled by no well settled rules, but, on the contrary, the existence of the lien is generally made to depend upon the peculiar state of facts and circumstances surrounding the particular case, that is whether or not a case of natural equity is established; and, if so, whether it is not made to yield to higher or superior equities in some other person—whether the party is not to be regarded as having waived it, or as having intended to waive or postpone it to another equity—or whether, by the acts or omissions to act, or by the neglect of the party claiming such lien to enforce it within a reasonable time, the right is not lost as being the superior claim. These considerations control and

vary the result as equity demands. It is true that it is some-
times an exceedingly difficult matter properly to adjust the
equities between parties making this claim and those having
rights in hostility to it. This case must be decided by apply-
ing to it equity considerations. The claim of the plaintiff in
this action, if it ever existed as a *lien*, it must be conceded,
remained a secret invisible lien or trust, undiscoverable by
any search of the public records. It is not made a *construct-
ive* lien by any positive law; and its existence could be known
only to the plaintiff and his immediate vendee, except by
actual notice given, which it is not claimed was given in this
case. The defendant's claim, it is not denied, is that of a
*bona fide* purchaser in good faith, upon a clear record evi-
dence of title, for a valuable consideration and without
notice of the plaintiff's claim.

The defendants insist that though the plaintiff's demand
was for the purchase-money of the property, that the sale
was made under such circumstances that, by the law of
equity, an intent to waive the lien by the plaintiff, is *neces-
sarily* to be inferred. This leads us to the examination, with
some minuteness, of the attendant and surrounding circum-
stances, into the nature, the object, and the intent of the
several contracts, and of the parties thereto, from which the
parties base their conflicting equities, and to the knowledge
of the plaintiff of the object to which the property was to be
devoted. This involves, also, the necessity of examining some
of the provisions contained in the charter of the Canandaigua
and Niagara Falls Railroad company, into the provisions of
the statute under which they were incorporated, into the acts
and probable motives of the parties in making their contracts,
of the knowledge of the parties of these provisions of the law,
and what considerations the law of equity will hold neces-
sarily entered into the contemplation of the several parties
at the time of making their several contracts. As to all the
*facts* in the cases there is no conflict. No witness except the
plaintiff was sworn in the case to any material fact. We
may therefore assume as true, the *facts* found by the referee;
and so far as other facts sworn to by the plaintiff appear, we

may regard them as true for the purpose of showing his intent as to the question of retaining or of waiving his lien, upon which facts the law of equity must act. A reference to a few of these leading facts may be necessary, in order to illustrate the view I have taken of the rights of the parties.

1. The plaintiff, before he conveyed his interest in the lands in question to the said railroad company, and previous to taking the notes in question, had been in their employ as their agent in acquiring land titles for them under their charter, and was also a stockholder in the company. The statute under which their charter was taken authorized the borrowing of money upon a mortgage to be given upon their corporate property and franchises for the purpose of completing, finishing and operating their road, and upon bonds to be issued, based on such mortgages. It is not then a forced or an unreasonable presumption, to hold, as against such an agent of the company as the plaintiff was, that he knew, not only the powers of this company in this respect under their charter, but also of their design and intent of mortgaging the lands he was so purchasing for them in order to complete, finish, and put the road in operation ; and this legal presumption of his knowledge is the stronger, from the fact that, at the time the plaintiff conveyed his land to them, the line of the road had been and was then laid out over his said land, and the franchise of the corporation existed over such land, and the $1,000,000 *mortgage* of the corporation upon all the rights and franchises of the corporation and on all the lands and real estate then owned, and all that should be thereafter owned by the said corporation, was then, and for two months previous had been on record in the clerk's office of that county. This mortgage recited upon its face the object for which it was given, to wit: that bonds might be issued upon it to raise money, the proceeds of which were to be applied to the completion of the said road, and it also recited the powers conferred in the statute for this purpose. To a mere stranger to their business and interests the record of a mortgage like this, prior to his conveyance to them, would not be constructive notice of its existence, or of their object

in making it; but, to the agent of this corporation engaged in acquiring titles for them, for such a purpose, it would be more than *constructive* notice—it is presumptive evidence, of a strong character of *actual* knowledge to him—that *bona fide* bond holders had advanced, or *would advance*, their money (it is immaterial which) upon the faith of this mortgage, and upon the faith of the public records as to title and incumbrances.

Upon the point in this case, that an equitable lien of a vendor for unpaid purchase-money is deemed to be *waived*, by acts of the vendor, from which it may be presumed that he did not intend to retain his lien, such facts as are above stated are controlling. It is inconsistent with good faith on his part that he should retain a secret lien under such circumstances, against such persons as he knew already had, or who would, advance their money on the faith of a clear record. Such acts are incompatible with an intent on his part of retaining a lien; they evince that he did not, at the time of making his conveyance, contemplate the holding of a lien. It is not honest, it is not good faith on his part, that he should retain such a lien against subsequent *bona fide* bond holders.

It is safe to assert that there is no authority to be found in the books, with one exception, that lays down the rule that such a secret lien can be set up in a court of chancery, as equal or superior to the claim of the *bona fide* assigns, without notice of the vendee. Sugden, in his work on vendors, it is said, lays down the rule in favor of the vendor's lien; but Chief Justice M ARSHALL, who examined this doctrine fully, in the case of *Bayley* v. *Greenleaf* (7 Wheat., 46,) repudiates the authority of Sugden, and says the weight of authority is the other way. The language of Chief Justice M ARSHALL, in that case, is so clearly to the point, and so ably reasoned and forcibly expressed, that I transfer it to this opinion. He says: " To the world the vendee appears to hold the estate divested of any trust whatever; and credit is given to him in the confidence that the property is his own in equity as well as in law. The vendor relying upon this lien, ought

to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is in some degree accessory to the fraud committed on the public by an act which exhibits the vendee as the complete owner of an estate upon which he claims a secret lien. It would seem inconsistent with the principles of equity and with the general spirit of our laws, that such a lien should be set up in a court of chancery to the exclusion of *bona fide* creditors." He further says, in effect, that the correctness of such a doctrine cannot be admitted until it has been *expressly* decided. It had not then (in 1822), been so decided. It has never been so decided since by any court of authority within the limits of my research. If it was not then the law, it is not now. As to what acts constitute a waiver of such lien, see *Brown* v. *Gilman* (4 Wheat., 255); *Maereth* v. *Symonds* (15 Ves., 349); *Herr* v. *Vandusen* (32 Barb., 94); *Coit* v. *Fongue* (36 Barb., 198).

If, therefore, the plaintiff is to be regarded as having knowledge that the railroad company had the power by law to mortgage said lands, and had given or intended to give the said $1,000,000 mortgage for the objects authorized by the statute, and that such mortgage covered the franchises, and all lands then acquired, and that should be acquired, and that such mortgage would instantaneously, upon the plaintiff's conveyance, cover the lands the plaintiff should so convey; and that such mortgage would be the basis upon which money would be advanced by innocent bond holders in good faith; if he knew the said railroad intended to take immediate possession of the land so conveyed, and grade and put on structures with the money so to be obtained; does not the necessary legal presumption arise, that the plaintiff intended to give them the power to mortgage and to waive, or that he intended not to claim his equitable lien thereon? I think it does. True, the referee does not find as a fact that he did or did not so intend, but the intent from given facts is a question of law. The facts are undisputed in the case. The law resulting from undisputed facts need not be found. It is for the court to pronounce what the law is upon them.

But I am not willing to decide this case alone upon the ground I have been considering, as it was not the ground taken by the referee who decided the case; and, suppose I am in error in the view I have taken, then,

2. The legal title of the land in question, upon which plaintiff's conveyance was made to the railroad company, vested in the latter. At the same instant, the lien of the mortgage which had before that been given by the railroad company, and which, before that time, remained but an equitable claim upon "*rights to be acquired*," according to the case of *Seymour* v. *The Canandaigua and Niagara Falls Railroad Company* (25 Barb., 308), became a vested *legal* right upon the premises in question. Assuming, now, for the purpose of the argument, the position urged by the plaintiff, that he did not intend to waive his equitable lien for the purchase-money, all he can then claim is, that his equitable lien attached at the same instant of time with the mortgage lien. Here, then, are two liens, accruing at the same instant, the one a secret equitable one, the other a legal, written, recorded, public one. The question would then seem to be, which of these liens has the priority? As between vendor and vendee alone, there is no question but this case does not present such a question. The learned referee assumes, in his decision, that both these liens were mere equitable ones. I think this was not so as regards the mortgage. This mortgage was executed in pursuance of an express provision of a statute of the State. It therefore became a legal mortgage, created for a legal purpose, and its lien must have been a legal lien upon all the premises it covered. (Session Laws of 1850, chap. 140, § 28; *Seymour* v. *The Canandaigua and Niagara Falls Railroad Company* (*supra*). This presents directly the question, which of two liens occurring at the same instant of time has the superior equity, the one a constructive one only, arising upon a secret trust by operation of law, or based upon the ground of its being a natural equity connected with the consideration of the property purchased, the other arising upon a specific legal lien based upon written contract, and made matter of public record?

Preliminary to the examination of this question, we may state what we understand to be settled law, generally, in regard to what is called a vendor's lien for unpaid purchase-money. I do not deem it necessary for this purpose to inquire, whether it is founded upon a trust, or is to be regarded as a natural equity. It is not based upon an express contract, but, wherever it exists, it is to be implied, from the presumed intention of the parties at the time of making the contract; and, as we have said, whenever circumstances exist at the time in the nature of the contract, or otherwise, from which it may be reasonably and necessarily inferred that the parties did not contemplate or intend to create this lien, it will be held not to exist, or to have been waived. The general rule, however, is, that, directly, as between vendor and vendee, such a lien exists to the extent of the unpaid purchase-money; and this extends to and against the heirs of the vendee, and his privies in estate, and against subsequent purchasers with notice of the lien; against purchasers who advance no new consideration; against voluntary assignees who are not within the meaning of the law of equity *bona fide* purchasers; and against judgment creditors of the vendee; but it does not exist against purchasers under a conveyance of the legal estate, made bona fide, for a valuable consideration, without notice, if they have paid the purchase-money. It would be in vain to attempt to reason against the conclusive argument of Chief Justice MARSHALL, in the case of *Bayley* v. *Greenleaf* (*supra*). No court in this State has ever yet presumed to question the authority of that case, on the contrary it is supported by cases in our books. (See *Ganson* v. *Green*, 1 Johns. Ch., 308–9.) This case does not present a fair occasion to overrule *Bayley* v. *Greenleaf* for the first time.

However potent this latent, *unwritten* equity lien has been regarded in cases between vendor and vendee, which I am not disposed to question, as between subsequent *bona fide* creditors, and the vendor, it cannot be held in a court of equity that it possesses a higher claim than would a *written* and unrecorded mortgage. In regard to the latter, a

search of the public records protects a purchaser against it. Upon every sound principle of the law of equity, as well as of public policy, bona fide purchasers and mortgagees who are about to invest money on the faith of title, should be held to have satisfied the demands of reasonable diligence, when they find an unincumbered record.

Upon the question of the superiority of liens, between such as are called *legal* and those which are called *equitable*, it is a maxim, coeval with the law of equity, that "where equities are equal the law must prevail." (1 Fonbl. Eq., ch. 4, § 25 and note; Francis' Maxims, 61; Story's Eq. Jur., § 64 c.) In Hargrave & Butler's notes to Coke upon Littleton 290 b, the rule is thus laid down: "If a person has the *legal* estate or interest in the subject-matter in contest, he must, necessarily, prevail at *law* over him whose right is only *equitable*, and not, therefore, even noticed by the courts of law. This advantage he carries with him so far, even into a court of *equity*, that, if the equitable claims of the parties are of equal force, equity will leave him who has the *legal* right in full possession of it, and will not do any thing to reduce him to an equality to the other, who has the equitable right only."

In the case of *Worral* v. *Marlar*, reported in a note to *Bosvil* v. *Brander* (1 P. Wms., 459, 460), Lord THURLOW remarked, " that a court of equity has much greater consideration for an assignment actually made by *contract* than for an assignment by mere operation of law." (See also 9 Ves., 100; Story's Eq. Jur., 1229; *Bayley* v. *Greenleaf*, 7 Wheat., 46, to the same effect.)

There is another well established rule of equity "that where the defendant has an equal claim to the *protection* of the court of equity for his title, as the plaintiff has to the *assistance* of the court to assert his title, the court will not interpose on either side, for there the rule is " *inequali jure melior est conditio possidentis.*" (4 Inst., 180; Best on Evid., 293, § 252.)

The referee held that, between these parties, "neither is prior, in time, to the other." The defendant, it is conceded, is in possession. The plaintiff, with whatever knowl-

edge the law will presume against him, from his being their agent in obtaining lands for their said road, actually sold them his lands for that purpose. To have acted intelligently for them it was his duty to know their powers and their designs. He had the opportunity of knowing them. He reserved no lien in his conveyance. If he knew of the railroad company's mortgage, or of their intent to mortgage, he did not exercise ordinary caution in omitting to reserve his lien in the conveyance. He took no written mortgage. Whenever the law gives this lien to a vendor, it gives it to him only for the purpose of working out an act of justice for him. The lien does not exist in his favor, as an inflexible rule, and, if it ever did, it ceases to exist when circumstances justify such a conclusion. It would be the clearest injustice to hold its existence, under the circumstances above stated, against *bona fide* mortgagees and bond holders, who have advanced their money on the faith of a clear public record as to title and incumbrances. It would be carrying the doctrine of these secret liens to an extent never before carried in any reported case in this State. It would overturn the case of *Bayley* v. *Greenleaf;* it would render insecure all dealing in titles, and the object of, and securities intended by, our recording acts would, in effect, be destroyed.

It is not perceptible how a greater degree of diligence could be reasonably demanded of these mortgagees and bondholders, than a faithful and diligent search of the public records for a clear title and freedom from incumbrances. A diligence equal to this on the part of the plaintiff cannot be claimed. He had the power to have made it public. Diligence in his own behalf, and duty to subsequent dealers with the title, under such circumstances, called for this precaution of putting his claim where it could be subject to public inspection. This lack of diligence on the part of the plaintiff should, in equity alone, give preference to the defendants. I think there is still another ground upon which to hold that the plaintiff did not intend or contemplate the holding of a lien for the purchase-money. He took an agreement to receive the one-half of the considera-

tion in stock of the company, that is to receive his pay in another commodity than money. It was an exchange of land for stock. No case has gone so far as to hold that the breach of a collateral agreement, even as between vendor and vendee, created a lien. If, at the instant of taking this collateral agreement, and to the extent of the amount mentioned in it, it was not a lien, a subsequent breach of it would not give relation back to such a lien. The decree makes this part of the consideration also a lien. This, I think, was also error.

3. The decree which the plaintiff did obtain is clearly unjust against the defendants in another sense. The *franchises* of this railroad company, with its rights and privileges and possibilities, are mingled in one with the mortgage upon the lands. This secret lien (if it exists) extended no further than to the land which the plaintiff conveyed; but the decree extends this lien beyond the land to the rights, franchises and possibilities to which the lien never could have extended. A sale under this decree carries with it rights not covered by the lien, it would sever and destroy the interest of *bona fide* holders under the mortgage of legal rights superior and prior to the claim of the plaintiff. These, as well as the public interests, under this decree, are all made to yield to the power of this secret, invisible lien or trust. Before the plaintiff conveyed his land, this mortgage was a *legal* mortgage lien upon all the rights and franchises of this railroad company; it was a *legal* mortgage upon all the lands that had been acquired, and was a mortgage in equity upon rights to be acquired, as held by the case of *Seymour* v. *Canandaigua and Niagara Falls R. R. Co. (supra)*. These *franchises* covered the plaintiff's land in one sense, because the line had been adopted which crossed his lands. His land was purchased to be appropriated as a part of this road. So, if the plaintiff's lien attached to the land for its consideration money, it did not attach to the franchises, which he did not sell, but only to the land subject to the franchises, which he did sell. Assuming his lien to exist upon the land, it would present an anomalous and most extraordinary condition of liens. It

would be this; the mortgagees would hold a *legal* mortgage upon the lands previously conveyed, and upon the rights and franchises of the road absolutely, and a legal recorded mortgage upon the lands conveyed by the plaintiff subject to the plaintiff's equitable lien; and the plaintiff's equitable lien on the lands conveyed by him would be subject to the *legal* lien previously acquired by the mortgagees upon the franchises, etc. A decree to enforce such a lien is in effect a severance of the franchises of the road from the road and its substantial interests, and a destruction of the corporation.

This effect, however, if the claim is good, must be submitted to. The plaintiff must recover in this case, if at all, upon the strength of his own case, and, his claim being in equity, he is bound to prove it to be better, more just, more equitable, than the defendant's claim, whether the latter be in law or in equity. "*Actori, incumbit probatio.*" Another rule applies, both in law and in equity. Where a loss must fall upon one of two innocent parties, both being free from blame, justice being thus in equilibrio, the party prosecuting must fail unless he prove his case to be the *better.* It is seldom the case that the scale of justice or of equity stands exactly upon an equipoise; it will generally be found that some laches, some negligence or want of caution, some want of good faith, will cause it to preponderate upon the one side or the other. It seems to me that the keeping of this secret claim by the plaintiff, while standing by and seeing *bona fide* mortgagees going on and improving it, advancing their money on it, upon the faith of a clear record, without his giving them notice of his claim, is a claim devoid of the merit of equity against the mortgagees. It is a claim not sustained by good faith, is unsuited to the policy of the country, to the rights of unrestricted alienation, and to the security of a people whose titles are subject to such frequent changes, and where the public records are and should be the reliance and security against incumbrance and defective titles. Although the existence of such liens is conceded to be the settled law in a class of cases, which can be enforced in equity, I think the plaintiff has not brought

himself within that class.   It seems to me he has been guilty
of such laches, such want of caution, such want of good
faith toward those who were expending their advances upon
the property, that his lien, if he ever had one, is lost as against
the defendants, and that he is estopped from setting it up or
from prosecuting it against them.

4. It is insisted that the foregoing views do not apply to
the case before us, inasmuch as the first mortgage upon the
said railroad did not exist against the plaintiff's land until
the conveyance was made by him, and that his lien was not
parted with at the time of the conveyance; that it must
therefore have existed prior to the lien by the mortgage, and
that it continued after the conveyance; that the mortgage
contained only an executory agreement for a lien, and that
the advance was therefore made on the promise of a lien, and
not on a present lien.   All this we have considered.   If the
vendor's lien ever existed, as an implied lien, it is conceded
that it was in force as against the railroad company as direct
vendees.   We have endeavored to show that it could not
have been intended by the parties, vendor and vendee, that
it should exist.   We have shown, upon authority, that it did
not exist against the *bona fide* purchasers under the mort-
gage.   We have shown that when the written mortgage lien
did take effect, it became superior to the lien by way of
secret trust, which is only a trust between the parties, etc., to
it.   And the learned referee held, and I think correctly, that
the first mortgagees held their lien upon the premises from
the instant the plaintiff's land was conveyed to the railroad
company.   The referee then assumed (not in his finding of
facts, but in his opinion) that the bond holders advanced
their money upon the faith of the mortgage before the
plaintiff executed his conveyance.   I do not think it material
to the case whether it was advanced before or after the con-
veyance; but the referee is not sustained in his assumption
by any fact in the case.   There is no evidence in the case
showing at what time the bond holders advanced their money.
The circumstances of the case would be evidence to the con-
trary of the referee's opinion.   The statute contemplates,

first, the making the mortgage upon the road, etc., the putting it on record before the issuing of the bonds, and as the basis upon which they are to be issued; the bonds then require to be issued, to be negotiated, etc., to obtain the means to construct the road. All this would seem to require more time than expired between recording the mortgage and the plaintiff's conveyance, but it is sufficient to say the plaintiff has failed to prove it to be as assumed.

But, subsequent to this time, and after the advance of the money by the bond holders upon the first mortgage, the railroad company, in the year 1853, executed two other mortgages upon their said road, and upon the same lands, rights, privileges and franchises as in the first mortgage—one for $750,000, the other for $600,000. In the suit to foreclose the first mortgage, the parties in interest in these two subsequent mortgages were made parties defendants, and all the rights and interests in the said premises and of the parties thereto, were sold by virtue of the decree so obtained upon all three of the mortgages. The defendants in this action became the purchasers. If the question could arise whether the mortgagees, or their assigns, or the bond holders, under the first mortgage, were purchasers in good faith, and for a valuable consideration, I do not see how this objection can be raised against the mortgagees and purchasers in good faith under the second mortgages. No question is raised that the latter mortgagees were not such in good faith. Surely, the lien of these latter mortgages was better than the plaintiff's secret lien. On this ground, also, I think the defendants, as purchasers in good faith, are to be protected against the plaintiff's claim; and, if his claim does exist, equity would postpone it, and make it junior to the second and third mortgagees. The defendants have the superior equity.

5. It is also urged that the defendants are not *bona fide* purchasers without notice, for that Potter, one of the defendants, before he paid the whole purchase-money had notice of the plaintiff's lien. An effectual and perfect answer to this objection is, that the sale was a legal and a valid sale. The bid was $500,000. Fifty thousand dollars was paid

down on the sale at the time of the bid and before any notice given. By this sale and payment of the bid the purchaser became entitled to all the legal and equitable rights which any one of the mortgagees had held. The recipient of the money paid on the bid was not bound to refund. The purchaser was not bound to increase his bid by the amount of the plaintiff's claim upon such a notice, but was bound to complete his purchase by paying the remainder of his bid. Notice before the payment of the purchase-money, does not apply to a purchaser after a valid sale who purchases under *bona fide* mortgagees who hold their mortgages without notice. As to Potter, the purchase being legal, he having ratified it by the payment of $50,000, the court would have compelled him to complete it, or forfeit what he had paid. The referee was clearly in error in supposing that a notice from the plaintiff to the purchaser after the sale, after he had paid $50,000 upon his bid, and but just before he paid the remainder had any legal effect against him, and was sufficient to charge him as not being a purchaser in good faith. His purchase was made when he bid, when he paid the installment and signed the agreement to pay the balance. Upon the whole case I am of opinion that the judgment was erroneous and should be reversed.

Judgment reversed, and new trial ordered.