LIZZIE [ELSIE] H. HARTER

*v.*

THE CAPITAL CITY BREWING COMPANY et al.

[Filed December 1st, 1902.]

1. Evidence examined and *held* insufficient to show a contract between a husband and wife whereby. she was to take stock in a corporation of which he was an officer, in part payment for land which she had sold to the corporation through him as its agent.

2. One who took a mortgage on land, with knowledge at the time that a portion of the purchase-price therefor had not been paid, took subject to the vendor's lien.

On bill to enforce a vendor's lien.

*Mr. R. M. J. Smith,* for the complainant.

*Mr. James Buchanan,* for the defendants.

REED, V. C.

In 1899 the complainant owned four lots of land in the city of Trenton. On August 10th of that year she made a deed for the said lots to the Capital City Brewing Company. The consideration expressed in the deed is $5,000. The sale was negotiated for the Capital City Brewing Company by the husband of the complainant, Mr. John W. Harter. He and several others had, on June 19th, 1899, filed a certificate of incorporation of a company for conducting a brewery business. Several sites for the erection of the buildings for such business had been examined, among them the four lots of the complainant. Mr. Harter was deputed by the company to acquire these lots.

It is undisputed that the price agreed to be paid for them was, not $5,000, but $3,500. It is admitted that only $50 of this sum has been paid. The ground upon which the defending

company, resist the imposition of the vendor's lien is that for $2,500 of the consideration the complainant had agreed to take stock of the company. There is no doubt that the taking of stock for this portion of the consideration was the subject of conversation between Mr. Harter and his wife. But the question is whether there was a contract, binding upon both parties, that such stock was to be issued and accepted. The evidence in respect to the contract rests almost entirely upon the testimony of Mr. and Mrs. Harter. Mrs. Harter says:

"At the time of the sale I told them I would sell them this property for $3,500, and they should give me $1,000 in cash and the $2,500 I would take in stock, two for one, as the rest of them had got their stock."

She says that the conversation in respect to the taking of stock was at the time she agreed to take $3,500 for the lots.

John Harter, the husband of the complainant, was treasurer of the company. He says the matter was placed in his hands to negotiate with Mrs. Harter. He says that the $3,500 were to be paid $1,000 in cash and $2,500 she was to get in stock, at the rate of two for one, as every other one got, except one or two other men, and they got two and a half for one.

Mr. Harter subsequently, when asked why the stock was not issued to his wife, said:

"It was only for the reason that Mrs. Harter was not to be in the matter, so far as the other gentlemen were concerned in the company, she never told them that she would take the stock; that is only a matter that I know of. The other people in the concern did not know of it. But Mrs. Harter told me—she said, 'If everything goes on all right I will take my $2,500 in stock at the rate of two for one, and I will take my $1,000 in cash.' 'All right,' I said, 'we will fix it up in that way.' Now, that was only to myself, the other people in the brewing company knew nothing about it."

Again, he said:

"Mrs. Harter said this to me understand, as my wife, I was working for the company; and she said, when I mentioned the matter to her in the first place, she said, 'I do not really need all this cash. Now, if you put me in same as the rest at two to one, same as the rest of you, I would be satisfied.' And I said, 'All right, we will try to put you in at two to one, same as the rest us.'"

Being asked, "When was this referred to?" he replied, "This was after our stock was issued—when the first shares of stock were issued."

It appears, also, that the deed was dated August 10th, 1899, and a check for $1,000 was drawn by the company in favor of Mrs. Harter on August 23d. It is in evidence that this check, by the request of Mr. Harter, was not presented to the bank for payment, because of the then financial condition of the company they wished delay.

No stock was ever issued to Mrs. Harter. On March 2d, 1901, a disagreement occurred between Mr. Harter and the other stockholders of the company, which resulted in his resignation as treasurer. Following his resignation, Carl Hauser, the president of the company, made a verbal tender of stock to Mrs. Harter, who was then present. She said she would not accept it.

The present position of the parties is that the defendant admits liability for the land sold, and the right of complainant to enforce the vendor's lien for $950, the unpaid portion of the $1,000 already mentioned. But it insists that all the complainant is entitled to, apart from this sum, is stock of the corporation of the face or par value of $2,500.

On the other hand, the complainant insists upon a lien for the whole amount still unpaid.

I will here remark that it is not to be conceded that the law is settled that if the contract was such as to permit the corporation to pay in shares of stock, the vendor's lien for such portion of the consideration was thereby lost.

In the case of *Fisk* v. *Potter, 2 Keyes 64, 77,* the New York court of appeals held, apparently without much consideration, that if the price for land is payable in some commodity other than money, the vendor's lien is lost. And it appears that the rule, as settled by the great weight of authority, that where the consideration for land sold is other land or personal property, with no monetary price fixed for which the land or personal property shall be delivered, there can be no lien. Thus, in the case of *Harris* v. *Hanie, 37 Ark. 348,* the consideration for the land sold was cotton to be delivered. In holding that there was no vendor's lien, the court said that a vendor's lien does not

arise to secure the performance of any act, the breach of the performance of which would create a claim for unliquidated damages. In this case there was no money consideration for the land expressed in the deed. But in the case of *Young* v. *Harris, 36 Ark. 162,* there was a price fixed for the land, and an agreement that this price should be paid for in personal services, and it was held that the vendor's lien existed. The amount of the consideration in that case was liquidated, and for that amount a lien existed until paid.

In *Plowman* v. *Riddle, 14 Ala. 169,* a note was given for a money consideration, which, by the terms of the contract of sale, the vendee had the right to discharge by delivering leather. In *Deason* v. *Taylor, 53 Miss. 697,* the consideration was a note payable in Mississippi certificates of indebtedness. In *Beal* v. *Harrington, 116 Ill. 113,* the consideration was certain lots of land and certain personal property, the prices of which lands and the price of which personal property were fixed. In each of these three cases the existence of a right to a vendor's lien was recognized.

A definitive statement of what should be the rule in this state under an agreement to take stock for a definite amount of the consideration expressed in money for a sale of land need not be made until it is ascertained whether such a contract exists.

To that point I will now direct my remarks.

It is to be first observed that the agreement to take stock must arise out of the testimony of Mr. and Mrs. Harter. The consideration for the property sold by Mrs. Harter to the company, expressed in the deed accepted by the company, was, as already remarked, $5,000. This is presumably the amount due from the company to Mrs. Harter. The only way the $5,000 is reduced to $3,500 is by the testimony of the two Harters. So, also, must the claim that $2,500 of the $3,500 were to be paid in stock rest upon the same testimony. There is no reliable testimony that, before or at the time of the execution of the deed, any person other than Mr. Harter spoke to Mrs. Harter about the amount to be paid or the manner in which it should be paid. Now, the testimony of these two is conclusive that in all the conversations between them concerning the stock which she was to take it was

understood that she was to have $2 worth of stock, at its par value, for each dollar of the $2,500. The accuracy of this testimony is rendered probable from the fact that no one of those who put in money received for it a less proportion of stock, and from the further fact that the money value of the property sold by Mrs. Harter seems to have been fully $3,500.

Nor is there any reliable testimony that either Mr. Harter or his wife ever represented to the officers of the company that the latter would take stock upon any other basis. I have no doubt that Mr. Harter stated to the company that his wife would take stock for $2,500, and it is probable that the matter of taking stock was mentioned in her presence. There is little doubt that both Mr. Harter and his wife expected that she would take stock to the amount mentioned, but it does not appear that Mr. Harter ever reported to the company that Mrs. Harter had agreed to take $2,500 of stock at its par value. Nor does it appear that Mr. Harter ever reported that his wife had agreed to take stock in the proportion of two to one. It seems entirely clear, therefore, that no such agreement as the defendant sets up was ever entered into between Harter and his wife.

Indeed, Mr. Harter seems to have regarded the proposal to take stock as only provisional; it was to be dependent upon whether everything turned out all right.

I think that his primary purpose in negotiating with his wife was to get her to forego her right to a cash payment of the consideration. He requested her to forbear the presentation of the $1,000 check; and I have no doubt he suggested the taking of stock for the remainder. He, at the same time, wished to protect his wife. His delay in seeing that she was put in the company as a stockholder, on the footing discussed between them, looks as if he was waiting to see how the business developed. She relied upon his judgment in respect to the investment of this portion of the consideration in stock. The entire transaction impresses me with the conviction that the first step in the negotiations was the adjustment of the money value of the property at $3,500. Then came the question of the manner of payment, and she consented to receive $1,000 in cash and to permit her husband to endeavor to put her into the company as

a stockholder for the remainder of the consideration at the rate of two to one. That she was likely and willing to take stock was undoubtedly spoken of among the members of the family, who controlled the company; but the proposition that she should receive stock in the proportion of $2 in par value of stock to $1 of the consideration was never presented to the company, and was never accepted by it.

Should the defendant be now permitted to pay the $2,500 by stock to the amount mentioned? I say permitted to do so, because it seems to me clear that it is not obliged to do so. It is not obliged to do so for the reason that any contract entered into by Mr. Harter to give stock in consideration of the land acquired was entirely aside from his authority. It is true that the scope of his agency in the matter is left quite indistinct, but I am sure that it amounted to no more than a power to see on what terms his wife would sell her property. I do not think he was authorized to close any contract until he had reported to the company. His position as an officer of the company and husband of the vendor made him a proper person to procure terms, but not a proper person to fix the terms of the sale. But even if he was equipped with the power to buy, that would not have authorized a barter.

Now, it is true that although Mr. Harter was not empowered to enter into a contract with his wife that she should receive stock, the corporation could have ratified his contract had it been called to its attention, and so could have put itself in the same posture as if it had originally authorized it. This, however, it has never done, for the terms were never reported to its officers. The point of doubt in my mind is, the arrangement being now disclosed, whether if it exhibits a contract between Mr. Harter and his wife, the corporation should now be permitted to elect whether it will ratify Mr. Harter's contract.

I doubt, however, whether a ratifiable contract was entered into between Mr. Harter and his wife.

Notwithstanding the general terms used by both husband and wife, to the effect that she was to take stock to the amount of $2,500, the whole testimony and the entire transaction impressed me with the conviction that the arrangement between them was

designed to permit her husband, in his discretion, to take stock. No doubt, as an officer of the company, he was concerned to have her forbear from insisting upon the payment of cash. I have no doubt that he explained to those concerned with him in the enterprise that he had avoided the payment of cash, and that she would probably come into the company by taking stock for a portion of the amount. Nevertheless, as I have already observed, he, and I think she also, regarded this arrangement as provisional. His delay in putting her into the company, and his refusal to issue stock to her, and his failure to state even the footing upon which she was to come in, seems to show that he was waiting to see how the business would develop. The confidence placed in his judgment by his wife, the fact that he was in the management of the company, induced her to empower him to make the investment.

I incline, however, to the opinion that it was a mere power, revocable by her at any time before its execution.

I am of the opinion that there should be a decree for the complainant.

I am also of the opinion that the mortgages of Mr. Charles Hauser are subject to the lien of the complainant, for it is entirely clear that he was aware, at the time he took his mortgages, that the consideration for the purchase of the property had not been paid to his daughter.