## WM. SILLERS et ux. v. W. V. LESTER et. al.

1. CHATTEL MORTGAGES AT LAW AND IN EQUITY.—Though at law a mortgage cannot operate on property not in existence at the time the mortgage is executed, courts of equity will enforce specific execution of contracts, and give relief in numerous cases of agreements relating to lands and things in action, or to contingent interests or expectancies, upon the maxim that equity considers that done, which being agreed to be done, ought to be done.

2. SAME IN RESPECT TO AFTER ACQUISITIONS.—To secure the payment of one year's rent of a plantation, the tenant executed to the landlord a mortgage upon all the mules, etc., then on the rented premises, upon all crops to be grown thereon, and upon all the mules, etc. to be put thereon during the year. *Held,* that the mortgage attached to the subsequent acquisitions referred to as soon as they were acquired, and was good against a subsequent mortgage made on the same property after it was acquired, especially as the subsequent mortgage was to secure an antecedent debt, and the subsequent mortgagee had notice of the prior mortgage.

APPEAL from the chancery court of Bolivar connty. HARMON, Chancellor.

The facts appear in the opinion of the court.

*Wm. Sillers,* for appellants.

The important error in the case is, that the court decided in effect that appellants' mortgage, which by its terms does so and was intended to do so, could not cover and attach to property placed on the demised premises after its execution, and that it is void as to a junior deed of trust to secure pre-existing debts, given after the property was brought on the place.

The law is precisely the reverse. It may be admitted, as a general rule of the ancient common law, that nothing can be conveyed *in presenti,* which is not in existence or does not belong to the grantor at the time the grant is executed.

But the principle has no application to the case before the court. The mortgagee here does not undertake to grant, *in presenti,* property of Zollicoffer & Greer not belonging to them or not in existence at the date of it, but carefully distinguishes between present property on the Asia place and that to be subsequently put on the place during the year 1870. The terms of the grant are: "All the mules, stock and farming implements which are now on said Asia plantation, or which Zollicoffer & Greer shall place on the same during the year 1870, also all the crops of cotton and corn to be raised on said Asia plantation during said year 1870."

There is no occasion to call in question or deny the soundness of the maxim urged against the effect of the mortgage upon the property in question, as its force and operation depend upon a different state of facts, and to which different principles are applicable. The inquiry here is, not whether a person can grant *in presenti* property not in existence or not belonging to him, but whether the law will permit the grant or conveyance to take effect upon the property when it is brought on the premises and belongs to the grantor, in fulfillment of an express agreement founded on a good, valuable and *bona fide* consideration, and this when no,

rule of law is infringed or rights of a third party prejudiced?

The mortgage bears date 21st December, 1869; the deed of trust the 27th October, 1870. The six mules, mare and colt, which are the subject of controversy, are charged to have been brought on the demised premises between those dates. The law is, that the mortgage attached to them immediately when they were brought on the place. Pennock et al. v. Coe, 23 How. (U. S.) 117, is full and conclusive on this point.

When the supreme court of the United States takes up a question and examines it carefully, and reviews the decisions of the various state tribunals upon it, and arrives at a decided conclusion, as it has done in Pennock v. Coe, I submit that, under our system of government, and for the sake of uniformity, its decision ought to be controlling. See also, Langton v. Horton, 1 Harris Ch. 549; 2 Seld. 179; 3 Green Ch. 377; 32 N. H. 484; 25 Barb. 284, 286; 18 B. Mon. 431; Redf. on Railways, 590, note; Winslow v. Mitchell, 2 Story, 630; 1 Pow. on Mort. 190; Coote on Mort. (lib. ed.) 185; Noel v. Burley, 3 Sim. 103; Metcalf v. Archbishop of York, 1 Myl. & Cr. 553; Matter of Howe, 1 Paige Ch. 129; White v. Carpenter, 2 ib. 266; Abbot v. Gordon, 7 Shepl. 408; Foreman v. Proctor, 9 B. Mon. 124; Jenks' Admr. v. Goffe, 1 R. I. 511; Field v. Mayor of New York, 2 Seld. 186; 2 Story Eq., §§ 1040, 1040 *b*; 2 Kent Com. (9th ed.) 468, notes; Foster v. Saco Co. 12 Pick. 453; 11 Ala. 980; 22 ib. 534; 26 ib. 353; Galveston Railroad v. Cowdry, 11 Wall. 480, 481.

The principle is cited with approbation by the high court of errors and appeals, in Summers & Brannin v. Roos & Co., 42 Miss. 786.

But counsel for appellees raise the objection in this court for the first time, that the mortgage is void so far as Zollicoffer is concerned; that it was made by his attorney by virtue of a power of attorney that was

neither sealed, proved or acknowledged; that the power of attorney is also invalid for uncertainty as to what was to be mortgaged, or what were to be the conditions.

A sufficient answer to these objections is, that they were not made or even alluded to in the court below, and it is too late to raise them now.

This court has repeatedly decided that it will not allow appellees to reserve and conceal in the court below what they conceive to be their strong point, and surprise appellants with it for the first time here, when it is too late to meet and rebut it with explanation and proof. 8 S. & M. 332; 10 ib. 301, 438, 440, 590; 12 ib. 130; 13 ib. 39, 295; 26 Miss. 362; 40 ib. 500; 42 ib. 98.

In the court below appellants' mortgage is accepted without objection as to either execution or record. It is acknowledged throughout the pleadings to be a valid mortgage, except as to the attempt to convey subsequently acquired property.

Zollicoffer & Greer recognized and acquiesced in the validity of the mortgage, and *non constat* but that it could have been shown that appellees had notice of its existence, and that it was recognized by Zollicoffer and Greer before the deed of trust was made, they nowhere deny it.

Perhaps the objection is not sound. Zollicoffer & Greer leased the Asia plantation together, jointly, as partners. The power of attorney says " in conjunction," and the power of attorney was made to authorize Greer to sign Zollicoffer's name to the notes and mortgage given to secure the rent. The objection is that the power of attorney was not sealed.

" This court has repeatedly held, in construing the statute, that whenever it is manifest that a scroll was intended to be used by way of seal, it must have that effect, whether it so appears from the body of the

instrument or from the scroll itself." Hudson v. Poindexter, 42 Miss. 306–'7; McRaven v. McGrier, 9 S. & M. 47; Whittington v. Clark, 8 ib. 485.

In other words, "whenever it appears, from the body of the instrument, that a scroll or seal was intended to be used, it must have that effect."

The power of attorney concludes thus: "Given under my hand and seal, this 18th November, 1869. F. Zollicoffer."

According to the foregoing authorities, this constituted the power of attorney a sealed instrument. Manifestly, it was the intention of Zollicoffer that it should be such, and the most that can be said, is that there has been a clerical omission to affix what in reality would have been surplusage.

If affixing a scroll to the signature would have constituted it a power of attorney under seal, without any words in the body thereof signifying that it was intended to be an instrument under seal, according to the foregoing authorities, *a fortiori*, by the same authorities must it be a sealed instrument, even without a scroll, when it appears from the body thereof that it was intended to be an instrument under seal. Can there be more magic or import in a symbolical flourish of the pen opposite to a signature, no matter whether made by the party or the draftsman, than in the solemn language and carefully expressed intention of the party?

Proof or acknowledgment of the power of attorney was only necessary in reference to its admission to record under the statute. The power of attorney was good, and without record thereof authorized the execution of the mortgage, just as the mortgage is good without proof, but cannot be recorded without it. The statute referred to by the counsel enacted nothing, and simply declared what was already the law, except in its provisions for recording. And if appellees had

actual notice, it dispensed with the necessity of recording.

The position, that the power of attorney is void for uncertainty, is untenable. Pennock v. Coe, 23 Howard. The parties rented "in conjunction," were to plant in conjunction, furnish, secure the rent "in conjunction" by note and mortgage. Ample power to mortgage was given, and all acts done by attorney ratified and confirmed. Mortgage on the common, joint, community, co-partnership property was obvious.

They were partners. "Partnership is a contract between two or more to place their money, effects, labor and skill in business, with the view to a communion of profits." Story on Partnership, §§ 2, 15, 18, 19, 20; Thorp v. Marsh & Pendleton, 40 Miss. 158; Parsons on Partnership, 41, 51, 55, 58, note (*d*).

Each partner may sell, pledge, or otherwise dispose of all partnership personalty. Story on Partnership, 94–96.

"One partner may buy and sell, assign and transfer, by way of either pledge or mortgage, and in trust or otherwise, in the name of the partnership" (Parsons on Partnership, 164, 165, note *k*; 172, note *w*; 180, note *i*), and may do this under seal.

Greer had the power to mortgage the entire partnership crops and stock by writing under seal; to sign the partnership name, if they had one, or sign Zollicoffer's name by himself as agent, for each partner is an agent of the partnership. Story on Partnership, § 1.

For the first error assigned, the decree of the chancery court ought to be reversed, and appellees' bill dismissed.

*Yerger & Nugent,* for appellees.

There is no doubt of the invalidity of the mortgage, so far as Zollicoffer is concerned, for several reasons.

A seal is an essential part of any mortgage; without a seal it is no deed; and no power of attorney, authorizing in terms the execution of a mortgage, is valid for this purpose unless signed, sealed, acknowledged and delivered. Rev. Code, 1857, art. 2, ch. 37. Mortgages take effect and are valid whenever they shall be delivered to the clerk to be recorded. Ib., p. 310, art. 23, ch. 37. Besides, the alleged power of attorney is invalid for another reason: it is uncertain, vague and indefinite. What was Greer to mortgage? Was it the stock, or the anticipated crop, or some other property; and what was to be its tenor and effect? It cannot be said that Zollicoffer acquiesced in it, and therefore validated the act of Greer, for *non constat* he ever knew anything about it, and a parol acquiescence can scarcely make valid that which was absolutely void *ab initio.* In this view of the case, the appellants, Sillers and wife, are really indebted to the appellees to the extent of the interest of Zollicoffer in the cotton seized and sold, and the mules other than those sepecially mortgaged to Glenn, trustee. What that interest would be could only be ascertained upon a proper statement of accounts in view of all the circumstances of the case. This point is, however, not specially made in the argument of counsel filed, and is adverted to here to show that the appellees had very little reason to ask a reversal of the decree in the court below.

The agreement filed and the issue joined present for the consideration of the court the question as to whether a party can mortgage personal property which he neither owns nor holds in possession. Fortunately, our statute has set at rest the vexed question as to a mortgage of crops to be grown in the future; but having no statute authorizing a mortgage of personal property not in possession, the mortgage in favor of Sillers and wife must be considered with reference to the common law.

The general rule is, that whatever property, personal or real, is capable of an absolute sale, may be the subject of a mortgage; and a mortgage of personal property not at the time in the actual possession of the mortgagor, or to which he has not then an actual title, is invalid. 2 Hill. on Mort. 379–520; 2 Story Eq. Jur., § 1021; 7 Bac. Abr. 181.

The cases relied upon as contradicting this view, without exception, so far as we have been able to discover, sustain it. The case of Floyd v. Monroe, 26 Ala. 352, was a mortgage upon personal property in possession, and upon the hire of negroes which the mortgagor might hire the succeeding year; and the court held the mortgage not void on its face. The point, as to whether the mortgage was invalid, in so far as it attempted to convey the hire of slaves not in possession, was neither properly raised in the pleading nor discussed by the court, nor was it decided in the case. The point turned upon the mortgage in respect to the personal property actually possessed by the mortgagor when he made the deed. In the case of Hudson v. Warren, 2 Harris & Gill (Md.), 415 the controversy was as to a mortgage executed on the 4th February, 1820, by J. & T. Vance, in favor of Warner & Vance, by which they conveyed "all and singular the books, stationery, goods, wares, merchandise, effects and property situate or being in the store No. 178, and then occupied by them." In February, 1823, the books and stationery then in the store were sold under the mortgage, and the sale was sustained, the court remarking: "There is no evidence to show that there was an entire sale of the old stock, and that it was replaced by new between the date of the mortgage and the sale by the trustees; or that any books or stationery were purchased in the intermediate time and mingled with the old stock; and in the absence of such testimony we cannot but intend that the sales

which took place under the superintendence of the trustees, were of the remnant of the stock of goods mortgaged."

We conclude, therefore, that the mortgage executed in favor of Sillers and wife, in so far as the mules and the mare and colt in controversy are concerned, is invalid, and that the decree of the chancellor should be affirmed.

TARBELL, J. :

In December, 1869, W. C. Greer and F. Zollicoffer leased of Wm. Sillers and wife, the "Asia plantation," so called, in Bolivar county, for the year 1870, agreeing to pay therefor $3,250, one-half November 1, and the other half December 1, 1870. To secure the payment of this sum, Greer and Zollicoffer executed a chattel mortgage on "all the mules, stock and farming implements which are now on said 'Asia plantation,' or which they shall place on the same during the year 1870; also, all the crops of cotton and corn to be raised on said 'Asia plantation' during the year 1870." This mortgage was duly recorded February 21, 1870, in the proper office. In October, 1870, Greer & Zollicoffer executed a trust deed to James Glenn, trustee, to secure an indebtedness "for money, supplies and general merchandise," evidenced by a promissory note to Lester & Co., in the sum of $1,350, and to W. B. Thompson on open account of $2,000; which deed embraced certain portions of the crops, and also fourteen mules and one mare and colt, with power of sale in case of default in payment by January 1, 1871. This deed was duly recorded in the chancery clerk's office of Bolivar county, October 29, 1870. In May, 1871, Lester & Co. and Thompson filed in the chancery court of Bolivar county their bill of complaint against Sillers and wife and Greer & Zollicoffer, setting forth the above mortgage to Sillers and wife, and deed of trust to Glenn,

and charging that the consideration of the mortgage was in part for an antecedent indebtedness; that six of the mules and one mare and colt, claimed by Sillers and wife under the mortgage, were purchased by Greer & Zollicoffer and placed on the plantation subsequent to said mortgage; that Sillers and wife were proceeding to enforce sale of the crops and property mortgaged, including the six mules and mare and colt; and the bill prays for an answer and discovery for an injunction restraining Sillers and wife as to the six mules, mare and colt, and for general relief, etc.

Greer & Zollicoffer appeared to this bill, but never filed any answer, nor other plea or demurrer.

Sillers and wife demurred generally, but the record shows no action upon the demurrer.

An answer by Sillers and wife follows, and this is made a cross-bill, wherein they deny that any part of the consideration of the mortgage was for an antecedent debt; admit the receipt of $1,025.45 on their debt from sales of cotton; aver that after the sales of cotton, Greer and Zollicoffer turned over to them, " in further liquidation of the balance of $2,224.55 still due them on their rent of 1870, all of their mules in number, one mare and colt, at a valuation agreed upon," leaving Greer & Zollicoffer still indebted to them; that the mules, mare and colt are still on the plantation; that the sum secured by said mortgage was *bona fide* for rent for the year 1870; that the six mules, mare and colt were placed on the plantation in March, 1870; that the deed of trust was executed to secure a debt due long prior thereto, and not for a valuable consideration; pray that this answer be taken as a cross-bill, and for process as to Lester & Co. and Thompson, etc.

The special commissioner, to whom was referred the notes and account of Lester & Co. and Thompson against Greer & Zollicoffer, reported due Lester & Co. $1,515, and to Thompson $2,621, which report was confirmed

By the final decree, a sale of seven mules and the mare and colt are ordered in payment of the debts due Lester & Co. and Thompson.

From this decree Sillers and wife appeal to this court, and they assign for error:

1. That the court erred in deciding that appellants' mortgage could not attach to property placed on the premises after its execution, and is void as to a junior deed of trust to secure an antecedent debt.

2. That the case was not ready for final hearing and was improperly disposed of by the court.

3. That the report of the special commissioner is erroneous and fatally defective in allowing the open account of Thompson without notice and without proof.

4. That the decree is variant from the report.

5. That the decree directs the sale of seven mules, whereas the bill claims only six, and does not pray for a sale.

6. That the court erred in deciding that the seven mules, mare and colt are in the possession of appellants, in the absence of any proof on the subject.

7. And the court erred in rendering a decree against the appellants in taxing them with costs.

The record is defective in several particulars. In the first place, the pleadings leave dates of delivery of the stock to Sillers and wife, by Greer & Zollicoffer, and of the seizure under their mortgage by the former, uncertain. No decree, *pro confesso*, as to Greer & Zollicoffer was taken, although no answer, plea or demurrer was interposed by them. A demurrer was filed by Sillers and wife, and does not appear to have been disposed of. The answer of Sillers and wife is made a cross-bill as to the complainants, with prayer for process, but the record presents no evidence of any action by the court or parties with reference thereto. No evidence is sent up, nor does the record show any

objections or exceptions on either side. The final decree is for seven mules, whereas only six are in litigation. There is an apparent defect in a power of attorney, by which some of the exhibits were executed, but this objection does not appear to have been taken in the court below, where it might, perhaps, have been corrected, if defective in fact. It is manifest, from the pleadings, that the consideration of the mortgage to Sillers and wife was the rent for 1870, and that the deed of trust was with full knowledge of the mortgage and to secure an antecedent indebtefiness.

The claim of Thompson was an open account, the items of which are not given *in extenso,* and this account would appear to have been allowed by the special commissioner without notice or proof.

But it is evident that the case is brought here for an adjudication of the chief question in controversy, which is as to the right of the respective parties to the six mules, mare and colt. The question presented is, whether a mortgage upon after-acquired personal property is valid, in equity, as against a subsequent lien upon the same property to secure an antecedent debt, and with full notice.

It is believed, that as to real estate, there is no question that a mortgage specifically pointing out the lands thereafter to be acquired and duly registered, will be upheld in equity in preference to liens created after the acquisition of the property. As to railroads, including both fixtures and chattels, the doctrine indicated has been repeatedly declared, and, indeed, is now fully established. 1 Powell on Mort. 194; 25 Barb. 284.

Were this a case at law, there could be no question as to the rule. The maxim, that "a person cannot grant a thing which he has not," is an axiom whose truth cannot be strengthened by illustration or demonstration. The thing itself is a patent impossibility, and the court, in Pennock v. Coe, 23 How. (U. S.) 128,

well say: "It may at once, therefore, be admitted whenever a party undertakes, by deed or mortgage, to grant property, real or personal, *in presenti*, which does not belong to him or has no existence, the deed or mortgage, as the case may be, is inoperative and void, and this either in a court of law or equity." In that case, however, the court proceed: "But the principle has no application to the case before us. The mortgage here does not undertake to grant, *in presenti*, property of the company not belonging to them or not in existence at the date of it, but carefully distinguishes between present property, and that to be afterwards acquired." That case arose between the mortgagees of the judgment creditors of a railroad company, and a mortgage of property to be acquired was sustained.

At law, it is uniformly and rightfully held, that a chattel mortgage cannot operate on property not in actual existence at the time of its execution. 25 Barb. 284. Courts of equity, however, "enforce the specific execution of contracts and give relief in numerous cases of agreements relating to lands and things in action, and contingent interests or expectancies, upon the maxim that equity considers that done which, being distinctly agreed to be done, ought to have been done." Ib. 302; Grounds and Rudiments of Law and Eq. 75.

Judge Story, in Mitchell v. Winslow (2 Story, 644), states this very distinct result of his own examination of the question: "It seems to me a clear result of all the authorities, that whenever the parties, by their contract, intend to create a positive lien, or charge, either upon real or personal property, whether then owned by the assignor or contractor or not, or if personal property, whether it is then in being or not, it attaches in equity as a lien or charge upon the particular property as soon as the assignor or contractor acquires a title thereto against the latter, and all persons asserting a claim thereto under him, either voluntarily, or with notice,

or in bankruptcy." In that case, the question was between the assignee in bankruptcy and the mortgagee of after-acquired personal property of the mortgagor.

Referring to this subject, the court, in 25 Barb. 305, say: "As soon as the property is acquired, or comes into existence, the lien in or upon it attaches. They come into being together, and co-exist. Equity executes the contract by holding that what is agreed to be done is done; that the right to the lien creates the lien." 1 Ves. 409, 410.

It is laid down as a rule, in 2 Story Eq. Jur., § 1040, that "courts of equity will support assignments, not only of choses in action and of contingent interests and expectancies, but also of things which have no present actual or potential existence, but rest in mere possibility; not, indeed, as a present positive transfer, operative *in presenti*, for that can only be of a thing *in esse*, but as a present contract, to take effect and attach as soon as the thing comes *in esse*." Story cites, in support of this rule, 2 Story, 630, and 17 Conn. 154; and in illustration of the doctrine, Langton v. Horton, 1 Hare, wherein it was held that "an assignment of a whale ship by way of mortgage, and of all oil, head-matter and other cargo caught or brought home on a whaling voyage, will amount to a good assignment of the future cargo of oil and head-matter obtained in the voyage," and "will be valid in equity, and will attach to the head-matter and oil when obtained." In this last case named, the contest was between the mortgagee and a judgment creditor of the mortgagor, and the creditor was enjoined; the mortgagee, upon the return of the vessel, having taken steps to reduce the property mortgaged to possession.

In Legard v. Hodges, 1 Ves. Jr. 477, there was a covenant to set apart and pay annual profits of land. *Held*, in equity, a lien on the land against the covenantor and claimants under him with notice. The court, in that

case, say it is a universal maxim "that, in a court of equity, as against the party himself and any claiming under him, voluntarily or with notice, raises a trust." And in a note to that case, by Sumner, it is said: "There is generally no difficulty, in equity, in establishing a lien, not only on real estate, but on personal property, or on money in the hands of a third person, where that is a matter of agreement, at least against the party himself, and third persons who are volunteers or have notice." And he cites 2 Story Eq. Jur., § 1231; Collyer v. Fallon, 1 Trem. & Russ. 469.

An assignment of future freight by the owners of a ship was sustained in equity. 1 Myl. & K. 488.

The vice-chancellor, in delivering his opinion in Langton v. Horton, 1 Hare, 549, says: "The substantial question in this cause is, whether the future cargo of the Foxhound * * * passed, either at law or in equity, by the assignment from Birnie to the plaintiffs. I lay out of view all question as to the operation of the instrument at law, and look at the case only as a question in equity." And he continues: "Is it true, then, that a subject to be acquired after the date of the contract cannot, in equity, be claimed by a purchaser for value under that contract?" He answers: "It is impossible to doubt, for some purposes at least, that, by contract, an interest in a thing not in existence at the time of the contract may, in equity, become the property of a purchaser for value." And he proceeds to enumerate several instances and adjudications, in illustration of which the one he was considering was very strongly in point in the case at bar. Among other rules of a court of equity, he states this: "And when this court has once established that the equitable ownership may be in one person and the legal ownership in another, the court must interpose where it is necessary to protect the equitable ownership, and for that purpose I am not aware that the court ever refuses its interposition."

Lord Cottenham, in Newlands v. Paynter, 4 Myl. & Cr. 408, in the case of personal chattels, affirmed that " equitable property must be protected."

Chancellor Walworth, 1 Paige, 125, held, that judgment creditors had no preference over prior equitable claims against the estate of the debtor; that a contract for a mortgage or sale of real estate has been preferred to judgments recovered subsequent to the contract; and that an agreement for a mortgage is, in equity, a specific lien on the land.    See also, 2 ib. 217.

1 B. Monroe, 124, was this: Proctor was to feed thirty head of cattle for a year, and at the end of that time was to have half the cattle for this trouble.    A mortgage by Proctor of his half of the cattle, before the end of the year, was held to create a prior equity to an attaching creditor.

2 Selden, 179, was an assignment for valuable consideration of demands against the Corporation of New York city for printing, having at the time no actual existence, but vested in expectancy merely.    *Held*, to be valid in equity as an agreement, and took effect as an assignment when the demands were subsequently brought into existence.    And 2 Story Eq. Jur., § 1040, 1040 *b*, 1055; 2 Story, 630; 1 Hare, 549; Story on Bailments, § 294, are cited in support of the adjudication. The court say:  " There was indeed no present actual potential existence of the thing to which the assignment or grant related, and therefore it could not and did not operate *eo instanti* to pass the claim which was expected thereafter to accrue to Bell against the corporation; but it did, nevertheless, create an equity, which would seize upon those claims as they should arise, and would continue so to operate until the object of the agreement was accomplished.    On this principle an assignment of freight, to be carried in future, will be upheld and enforced against the party from whom it becomes due.    *    *    *    Whatever doubts may have

existed heretofore on this subject, the better opinion, I think, now is, that courts of equity will support assignments, not only of choses in action but of contingent interests and expectations, and of things which have no present actual existence, but rest in possibility, provided the agreements are fairly entered into and it would not be against public policy to uphold them."

36 Vt. 452 was a contest between first and subsequent mortgagees of a railroad company. The first mortgage was informal and invalid upon technical defects, while the second was complete in all respects. The court say of the first: "We regard them as standing upon a prior and superior equity against a subsequent one depending upon a legal title that was taken charged with notice of such prior and superior equity."

An imperfect agreement intended as a security was supported as a mortgage on real estate as against judgment creditors, in 3 Des. 74, and the court say of 1 P. Wm. 277: "The court there decided that if one agrees, for a valuable consideration, to convey lands to one person, and afterwards confesses judgment to others, the agreement to convey will bind the land in equity, and shall defeat the judgments; and this has been the settled doctrine ever since." 3 Ves. 582. See also, 2 Serg. & Rawle, 11, and 3 Bing. 347, note.

Although there cannot be a pledge, technically speaking, of a chattel not in existence, there may be an hypothecation, so that as soon as the chattel shall be produced the lien will attach. This was held in 14 Pick. 497, where it was stipulated by a brickmaker that the lessees of a brickyard should retain the bricks to be made as security for the advances to the brickmaker.

In Montague on Liens, 36, note *c*, it is said that " it is usual to speak of lien by contract, though that is more in the nature of an agreement for a pledge.

Taken either way, however, the question always is, whether there be a right to detain the goods till a given demand shall be satisfied;" citing Gladstone v. Berly, 2 Mer. 404. And this presents the question under consideration with precision.

Hilliard on Mort., vol. 2, p. 379, § 4, contains this commentary on the subject under consideration : "With reference to the mortgage of future property, it is laid down as the general rule in England that an assignment will not at law pass chattels not in existence, or in the ownership of the grantor, or not sufficiently not appropriated at the time of the assignment, although such an assignment may have effect by a subsequent act of the grantor in furtherance of the original disposition. And accordingly, a bill of sale of the furniture and effects in a certain house will only pass such things as are in the house at the time of the grant, though effects to be subsequently brought on the premises are expressly included. But the instrument might, it seems, be so framed as to give the mortgagee a power of seizing such future chattels of the grantor as they should be acquired by him and brought upon the premises; and such future chattels will pass where there is already a foundation of an interest in the grantor."

And this author adds, what is quite true, that "the doctrine upon this subject in the United States has been somewhat various." In Carr v. Allot, 3 Hurl. & Nov. 964, cited in a note by Mr. Hilliard, it is said: "When, on the face of an assignment of personalty, it is plain that it was intended to operate as a continuing security, and to apply to property afterwards acquired and substituted for that which was originally assigned, it will, if the words are capable of such a construction, be so applied; and where, in such a case, the deed was found capable of such a construction, although rather in the indirect power of attorney, that in the

way of direct conveyance, it was construed to extend to stock and growing crops on a farm not occupied by the assignor at the time of the execution of the deed."

In another case, cited in the notes by Mr. Hilliard (vol. 2, p. 381), a mortgagee was justified in seizing after-acquired property, on the ground that the mortgage authorized such seizure.

The doctrine declared by Judge Story was a well recognized principle of the civil law, and thus stated: " Those who bind themselves by any agreement whatsoever, may, for the security of their performance of the engagement on their part, appropriate and mortgage, not only the estate they are masters of at the time of contracting, but likewise all the estate which they shall be afterwards seized or possessed of. And this mortgage extends to all things which they shall afterwards acquire, that are capable of being mortgaged, by what title soever it be that they acquire them, and even to those which are not in being when the obligation is contracted, so that the fruits which shall grow upon the lands will be comprehended in the mortgage of an estate to come." Domat (Cush. ed.), 649, art. 5.

The object of equity is to do that exact justice between litigants which the truth and right demand, regardless of technicalities; and though not prepared to adopt broadly the rule laid down by Judge Story, yet we can see great propriety in the application of his views in a proper case, and when necessary to carry into effect the honest and just contracts of parties according to their real intentions. Indeed, it is the common practice of equity, both in England and in this country, to proceed untrammelled by the technical rules of the common law, and to do right between contestants as far as human imperfection will permit.

In the case at bar, upon the imperfect record before us, we are impressed with the superior equity of the

appellants, but the testimony is not sent up, and there are technical errors in the proceedings of the court below.

The absence of equity in the complainants we have already indicated, to wit: That their deed of trust appears to have been executed to secure an antecedent debt, and with full knowledge of the mortgage to Sillers and wife.

On the other hand, the equities of Sillers and wife as *bona fide* claimants, confirmed, within the cases cited, by a delivery of the property in controversy, to them, by Greer & Zollicoffer, have been indicated.

In view of the whole case, we reverse the decree and remand the cause for further proceedings.